# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 27

OCTOBER TERM, A.D. 2015

**March 2, 2016**

DEREK EARL HILL,

Appellant
(Defendant),

v.                                                                    S-15-0133

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Park County*
*The Honorable Steven R. Cranfill, Judge*

*Representing Appellant:*
    Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel.  Argument by Ms. Olson.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Joshua C. Eames, Assistant Attorney General.  Argument by Mr. Eames.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   A jury found Derek Earl Hill guilty of five counts of reckless endangering, three counts of aggravated assault, and one count of eluding police. He appeals his conviction claiming there was insufficient evidence of aggravated assault, the district court abused its discretion when it admitted evidence of law enforcement officers' reactions to a fired shot, and there was prosecutorial misconduct during closing arguments. We affirm.

## ISSUES

[¶2]   1.   Was the evidence presented at trial sufficient to prove Mr. Hill threatened to use the weapon he was carrying?

2.   Did the district court abuse its discretion when it permitted evidence of law enforcement officers' reactions to the fired shot?

3.   Did the district court abuse its discretion when it denied Mr. Hill's motion for mistrial based upon prosecutorial misconduct?

4.   Did the prosecutor's comments during closing misstate the law, or constitute improper vouching?

## FACTS

[¶3]   Lelon Tucker, his wife Nichelle Tucker, and their three children (ages four, two, and six months) went to the Red Lakes area near Cody to practice shooting early in the evening. The couple left the children in their Avalanche with the windows rolled down while they shot at targets that they had set against a berm. After they had been there a while, Mr. Tucker noticed a car (occupied by Mr. Hill) sitting on the hill about 500 yards away. The Tuckers had finished shooting and taken their two older children out of their Avalanche to go to the bathroom. They were preparing to leave when Mr. Tucker noticed that Mr. Hill's car had moved to within 100 yards of them. Mr. Tucker was not comfortable with the situation, so he and his wife quickly loaded the children into the Avalanche and began to drive home.

[¶4]   Shortly thereafter, Mr. Hill's car got "up on [the] rear end of [the Tuckers'] vehicle," near the bumper, and began revving its engine. Mr. Tucker pulled over twice to allow Mr. Hill to drive around him, but both times Mr. Hill pulled over and stopped behind Mr. Tucker's truck. After he pulled over a third time, Mr. Tucker backed up. Mr. Hill backed up as well. Mr. Tucker began driving again and pulled over one last time; Mr. Hill stopped about fifty yards behind him. Mr. Tucker then turned his truck around and headed toward Mr. Hill's car.

1

[¶5]    Both Mr. Tucker and his wife testified that as they got closer, they noticed a rifle on the dash of the car, facing out the windshield, pointed directly at them, and that Mr. Hill peeled away from them.  Mr. Tucker testified that he then instructed his wife to call 911, turned his vehicle around, and began to follow Mr. Hill's car.  He testified that Mr. Hill slid his car sideways so that the driver's side was facing toward the Tuckers' truck, and he decided to "punch it," driving directly through the space in front of Mr. Hill's car.  According to Mr. Tucker, Mr. Hill followed the Tuckers at a close distance, but eventually dropped back as they approached Cody.

[¶6]    Cody police officers Scott Burlingame and Eric Wright (who was in training at the time) responded to the 911 call.  The officers were in the vehicle together when they located Mr. Hill's car.  As the officers approached Mr. Hill's car, they observed it make turns without signaling and run through two stop signs.  Officer Burlingame turned on his overhead lights and siren and Mr. Hill sped away from the officers, reaching a speed of 90 miles per hour in a 30 mile-per-hour zone.  They pursued Mr. Hill as he headed back toward the Red Lake area over a rutted gravel road.  Officers Burlingame and Wright were joined by Park County Sheriff Deputy JJ Schwindt, who pulled in behind their vehicle, and the chase headed out of the Cody city limits.  Because of the rough road, Mr. Hill's car started to bottom out, began leaking fluid, and eventually came to a stop.  By this time, the sun had gone down and it was getting dark.

[¶7]    After Mr. Hill's car stopped, the Cody officers stopped their vehicle, and Deputy Schwindt pulled a little behind them.  Officer Burlingame had his overhead light bar, headlights, and spotlight on.  Mr. Hill got out of his car, holding an assault rifle.  The law enforcement officers ordered him to "[s]how us your hands" and "[g]et on the ground," but Mr. Hill took off running.  About ten seconds later, a shot was fired.  Officer Burlingame told Officer Wright and Deputy Schwindt to "take cover."  He turned his lights and spotlight off and advised other units that were approaching to turn their lights off as well.  Approximately two minutes later, three more shots were fired in the distance.

[¶8]    Mr. Hill testified that as he took off running, he "ended up tripping and sliding, discharging the first" shot; that he did not fire at the officers; and that when that shot discharged, the barrel was pointed toward the ground.

[¶9]    Both Officers Burlingame and Wright testified that when the first shot was fired, they did not see any muzzle flash from the rifle.  Officer Burlingame testified he did not see any dirt fly up after the first shot.  Deputy Schwindt testified that he saw Mr. Hill "turn[] slightly back towards our direction," and "saw a muzzle flash come from the end of the rifle" when the first shot was fired, but did not see any dirt fly up.  No bullets or spent casings were recovered from the scene.  Mr. Hill was apprehended the next day.

2

[¶10] A jury convicted Mr. Hill of five counts of reckless endangering, three counts of aggravated assault, and one count of eluding police. Mr. Hill timely perfected this appeal. Additional facts, testimony, and argument will be set forth below, as necessary.

## DISCUSSION

### I. Was the evidence presented at trial sufficient to prove Mr. Hill threatened to use the weapon he was carrying?

[¶11] Mr. Hill was convicted of three counts of aggravated assault, one count for each law enforcement officer who was on the scene when the shots were fired. He argues that the State presented insufficient evidence to establish beyond a reasonable doubt that he threatened to use a drawn deadly weapon because it did not prove that he made an actual threat. Mr. Hill maintains that because he was running away from the police officers, made no verbal threats as he ran, and the rifle was not pointed toward the officers, he never made an "actual threat" as required for aggravated assault.

[¶12] Our standard of review of sufficiency of the evidence claims is well established.

> [W]e review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses.

*Levengood v. State*, 2014 WY 138, ¶ 11, 336 P.3d 1201, 1203 (Wyo. 2014) (quoting *Brown v. State*, 2014 WY 104, ¶ 8, 332 P.3d 1168, 1171-72 (Wyo. 2014)).

[¶13] We recently explained that in applying this standard,

> [W]e must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. In other words, we do not consider whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder.

*Id.* at ¶ 12, 336 P.3d at 1203(internal citations and quotation marks omitted); *see also Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 966-67 (Wyo. 2015).

[¶14] Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2015) states:

> (a) A person is guilty of aggravated assault and battery if he:
>
> . . . .
>
> (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]

[¶15] We have defined the phrase "threatens to use" as requiring "proof of an actual threat of physical injury during the act of employing a deadly weapon." *Johnston v. State*, 747 P.2d 1132, 1134 (Wyo. 1987). We explained that the mere presence of a weapon in hand is insufficient to satisfy the "threatens to use" element. *Id.*; *see also Gunderson v. State*, 925 P.2d 1300, 1304 (Wyo. 1996). In *Johnston,* we also approved of the trial court's instruction to the jury defining a "threat":

> A threat is an expression of an intention to inflict pain, injury, or punishment. It may be expressed by words or acts, or a combination of words and acts. Considering all of the circumstances of the case, you must decide whether the defendant's words and acts amounted to an express or implied statement of his intention to use a drawn deadly weapon to inflict pain, injury, or punishment.

747 P.2d at 1135.

[¶16] In *Cox v. State*, 829 P.2d 1183, 1185 (Wyo. 1992), an intoxicated defendant approached a police officer, brandishing a hunting knife. In upholding his conviction for aggravated assault, we held that "[a]s a general intent crime, aggravated assault requires only that intent which may be inferred from doing the act which constitutes the offense charged; i.e. slashing back and forth with the hunting knife." *Id.* at 1186.

[¶17] Mr. Hill insists that because he made no verbal threats to the officers and because the evidence does not conclusively prove the rifle was pointed in the direction of the officers when it was shot, he could not have threatened to use the rifle against the officers as he ran away. We disagree. The lack of a verbal threat does not necessarily defeat a charge of aggravated assault. A threat to use a drawn deadly weapon may be proven solely by a defendant's actions or may be proven by words, or a combination of words and actions. *Johnston*, 747 P.2d at 1133 (threat "may be expressed by words or acts, or a combination of words and acts"). Further, the notion that the rifle may not have been

pointed in the direction of the officers at the time it was fired does not mean that a jury could not properly infer that the shot was an expression of an intention to inflict pain, injury, or punishment. *See Hart v. State*, 2003 WY 12, ¶¶ 6, 10, 62 P.3d 566, 569-70 (Wyo. 2003) (holding handgun in the air for victim to see was sufficient to constitute a threat).

[¶18] We have previously found sufficient evidence to uphold a conviction for aggravated assault where no one saw the defendant with a weapon and where there was no evidence that he had the weapon in his immediate possession. In *Ewing v. State*, 2007 WY 78, ¶ 4, 157 P.3d 943, 944 (Wyo. 2007), the defendant had retreated to his shed, and when officers arrived on the scene and attempted to open the doors, he yelled, "Any [m…... f……] that comes in that door is going to get shot, then I'll shoot myself in the head." At that point, the officers withdrew and the confrontation ultimately ended when officers fired pepper spray into the shed, forcing the defendant out. *Id*. at ¶ 4, 157 P.3d at 944-45. There was testimony that there had been a rifle on the floor of the shed two days before the incident, and when the officers entered the shed, they found the rifle in the open. *Id*. at ¶ 15, 157 P.3d at 947. We held that "those facts, combined with [the defendant's] statement that he was going to shoot the officers, allowed for the reasonable inference . . . that the rifle was 'drawn'" and supported the jury's conclusion that the defendant had committed an aggravated assault. *Id*. at ¶ 16, 157 P.3d at 947.

[¶19] We have also found sufficient evidence where the weapon was not pointed toward the victim. In *Hart v. State*, 2003 WY 12, 62 P.3d 566 (Wyo. 2003), the defendant, angered by a breakup with his ex-wife, went to the front door of her parents' home, and ordered her father to let him in. *Id*. at ¶ 6, 62 P.3d at 569. After her father told him to go home and cool off, the defendant responded by pulling a gun out of the back of his pants. *Id*. He held the gun up, pointing it toward the sky directly in front of a window, so that her father could see. *Id*. When it became apparent he would not be allowed to enter the home, the defendant walked toward his pickup truck, stopped, shot four rounds into his ex-wife's pickup truck, and then drove off. *Id*. On Hart's appeal for insufficient evidence, we affirmed, holding that "given Hart's demands and his display of a deadly weapon to the man resisting his demands, we are satisfied that a jury could rationally conclude that Hart made an actual threat to use a drawn deadly weapon [on his ex-wife's father]." *Id*. at ¶ 10, 62 P.3d at 569-70.

[¶20] Similarly, in this case, viewing the evidence in the light most favorable to the State, we find sufficient evidence for the jury to have rationally concluded that Mr. Hill threatened to use his rifle on the three officers. When the officers began pursuing Mr. Hill's vehicle, he ran two stop signs, he proceeded to speed away from the officers reaching a speed of 90 miles per hour, and when his vehicle stopped, he fled on foot with his AK-74 rifle in hand, despite orders from the law enforcement officers to show them his hands and get on the ground. He turned slightly back toward the officers and fired a single shot. He continued to run away from the officers and, about two minutes later,

fired three more shots. Given that the law enforcement officers had been in pursuit of Mr. Hill, and Mr. Hill's response, which included defying their orders and carrying a deadly weapon and firing it as he ran away from them, we are convinced that a jury could rationally conclude that Mr. Hill made an actual threat to use a drawn deadly weapon on the officers.

## II. Did the district court abuse its discretion when it permitted evidence of law enforcement officers' reactions to the fired shot?

[¶21] Mr. Hill challenges the district court's decision to allow testimony of the officers on the scene regarding their reactions once the first shot had been fired. Defense counsel filed a pre-trial motion in limine seeking to exclude evidence of what counsel characterized as "victim impact" testimony. Counsel argued that the State should be precluded from "discussing or inquiring about subjective fear of the officers as it is not relevant to the existence of an actual threat of physical injury" and is "highly prejudicial and designed to prejudice the fact finder." The district court denied the motion, and defense counsel renewed his objection to the testimony at trial.

[¶22] Because Mr. Hill raised objections during trial, we review the trial court's evidentiary rulings for an abuse of discretion:

> Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.
>
> *Brock v. State*, 2012 WY 13, ¶ 23, 272 P.3d 933, 939-40 (Wyo. 2012) (quoting *Edwards v. State*, 2007 WY 146, ¶ 7, 167 P.3d 636, 637 (Wyo. 2007)). "The ultimate issue that we decide in determining whether there has been an abuse of discretion is whether or not the court could have reasonably concluded as it did." *Edwards v. State*, 973 P.2d 41, 45 (Wyo. 1999) (quoting *State v. McDermott*, 962 P.2d 136, 138 (Wyo. 1998)).

*Lawrence v. State*, 2015 WY 97, ¶ 10, 354 P.3d 77, 80 (Wyo. 2015). "Upon a finding of abuse of discretion, we must then determine whether the error was prejudicial. 'Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made.'" *Toth v. State*, 2015 WY 86A, ¶ 29, 353 P.3d 696, 705-06 (Wyo. 2015) (citation omitted).

[¶23] There were three officers on the scene at the time the shots were fired: Cody police officers Scott Burlingame and Eric Wright, and Deputy JJ Schwindt from the Park County Sheriff's Office. At trial, all three law enforcement officers testified regarding the events transpiring immediately after Mr. Hill exited his vehicle.[1]

[¶24] Officer Burlingame testified:

> Q. [State's counsel]: Approximately how long from the time that Mr. Hill exited the car until that shot was fired?
>
> A. [Officer Burlingame]: Approximately ten seconds.
>
> Q. All right. And what did you do then?
>
> A. I took cover behind my vehicle.
>
> Q. Why did you do that?
>
> A. I was in fear for my life. I told the other officers that were on the team -- Deputy Schwindt had just arrived and Eric Wright. You can hear me say "Take cover." We got down behind our vehicles for fear of being shot.
>
> Q. Can you explain why?
>
> A. Yeah. We didn't want to get shot.
>
> . . . .
>
> Q. All right. When you say "Take cover," what does that mean?
>
> A. Get down. Get behind something that could potentially help stop bullets.
>
> Q. And what did you do?

---

[1] Mr. Hill challenges the admissibility of certain testimony given by both Officer Burlingame and Officer Wright, but does not complain of error with respect to the testimony of Deputy Schwindt. Thus, Deputy Schwindt's description of the events will not be discussed here.

A. I got down behind -- I believe it was my passenger side, right behind my passenger-side rear wheel.

. . . .

Q. All right. Now, in terms of what you did next, what's going through your head? What's your plan as a law enforcement officer in this circumstance?

A. I advised, I think, fairly quickly the other units to make sure they turned their lights off. We didn't know where the suspect had gone at that point. I didn't know if he was just out there laying in the sage brush. I had no idea. While we were -- while we were kind of formulating a plan on how to get everybody in there, we heard a couple more shots being fired.

Q. Okay. Do you recall specifically how many additional shots you heard fired?

A. Three.

[¶25] Officer Burlingame was asked whether he had a "heightened sense of the possibility of being injured" and he responded, "Absolutely." He went on to explain, "Given the circumstances, a suspect that I'm pursuing gets out of the vehicle with a rifle, . . . I obviously assumed that I was being shot at and told my trainee, 'You need to get down,' and the same thing with [Deputy Schwindt]."

[¶26] And, when asked why he turned his lights off, Officer Burlingame responded:

A. Right. I turned my lights off, because we were exposed. It's no different than sitting around a campfire. When you're sitting around a campfire, you can't see but ten feet past that campfire. Shut all the lights off, and your eyes acclimate. You can see obviously anybody standing just outside -- outside of the light that you could see in, and we were very far exposed. And, again, I radioed to the incoming units. I didn't want them to get shot.

Q. You felt like you were in danger?

A. Absolutely.

8

[¶27] Officer Wright, a trainee in the Cody Police Department, who was riding with Officer Burlingame, also testified.

> Q.    [State's counsel]: When you heard the shot, what did you do?
>
> A.    [Officer Wright]: We immediately took cover.  I mean, I felt very threatened at the time.   I think that's a police officer's worst nightmare.  I guess at one point I thought in my short career -- it may be over.  I felt very threatened at that point.
>
> Q.    All right.  When you say "take cover," can you explain what you did exactly?
>
> A.    Sure.  Officer Burlingame and I just basically stepped out of the vehicle with the doors open.  Once we heard the report of the rifle, we scurried to the back of the vehicle to try and get even more cover between us, and I guess the person that was shooting towards us.
>
> . . . .
>
> Q.    Okay.  Now, you're in the cover position. What happens next?
>
> A.    Well, there were three officers out there, Officer Burlingame and myself and Deputy Schwindt, and I knew that Deputy Schwindt was behind us somewhere. Immediately after the shots were fired I radioed that, and I believe Officer Burlingame also radioed shots fired.
>
>      We had other officers on the way.  And, again, it was dark.  I had no idea where our suspect was, so we were just hunkered down behind the car and waiting for our backup to arrive.
>
> . . . .
>
> Q.    All right.  Okay.  Now, the first shot that you heard, talk about the report of the rifle, the sound of the shot.

9

A.   You know, I'm a pretty avid hunter, so I understand what guns sound like.   And so when the suspect fled the vehicle and I heard that sound, there was no question in my mind that was a gun.

And in my situation I thought it was coming right at me, so I was scared at that point.

Mr. Hill claims that the district court abused its discretion by allowing this testimony.

[¶28]   Mr. Hill first asserts that this testimony is victim impact testimony and, therefore, should not have been admitted. Generally, "[t]he testimony of victims of a crime describing how it affected their lives after the crime is irrelevant" with respect to the question of whether a crime has been committed. *Jensen v. State*, 2005 WY 85, ¶ 16, 116 P.3d 1088, 1094 (Wyo. 2005) (citing *Moore v. State*, 2003 WY 153, ¶ 27, 80 P.3d 191, 198 (Wyo. 2003)).   Mr. Hill also argues that the statements by the law enforcement officers regarding whether they felt threatened are irrelevant; and, even if they are relevant, their probative value is exceeded by the danger of unfair prejudice.

[¶29]   The testimony of Officers Burlingame and Wright is not victim impact testimony because it does not tend to establish how the crime affected their lives.   Rather, their testimony concerned the immediate aftermath of the first shot, when they were on the scene and still responding to the initial 911 call. *See Jensen*, 2005 WY 85, ¶ 17, 116 P.3d at 1094 ("The testimony did not tend to establish the impact of this crime on [the victim's] or [her son's] lives[.]").   The question that must be answered, however, is whether the testimony that the officers thought they were being shot at, feared for their lives, and took cover is relevant and, if so, whether any probative value is outweighed by the danger of unfair prejudice.

Before evidence can be admissible, it must be relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. . . ."

Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice."

*Thomas v. State*, 2006 WY 34, ¶ 28, 131 P.3d 348, 356 (Wyo. 2006) (quoting *Hernandez v. State*, 976 P.2d 672, 676 (Wyo. 1999)).

[¶30] "In criminal cases, evidence is always relevant if it tends to prove or disprove one of the elements of the crime charged." *Hernandez v. State*, 976 P.2d 672, 676 (Wyo. 1999) (quotations marks and citations omitted). The victim's response, injury, or perception of threat is not an element of the crime of aggravated assault with a deadly weapon. Wyo. Stat. Ann. § 6-2-502(a)(iii). By contrast, other criminal statutes require a victim to perceive the alleged threat in order to establish the existence of the crime. For example, first-degree sexual assault, under Wyo. Stat. Ann. § 6-2-302(a)(ii) (LexisNexis 2015), includes as an element "the victim reasonably believes that the actor has the present ability to execute these threats[.]" There is no such element in aggravated assault under § 6-2-502(a)(iii), and we will not read language into a statute that is otherwise clear and unambiguous. *See Wyo. Cmty Coll. Comm'n v. Casper Cmty Coll. Dist.*, 2001 WY 86, ¶ 16, 31 P.3d 1242, 1249 (Wyo. 2001). Thus, as a general matter, "[w]e are not concerned with the subjective reaction of the victim." *Levengood*, 2014 WY 138, ¶ 19, 336 P.3d at 1205.

[¶31] The State argues, however, that the testimony of the officers is relevant to the question of whether Mr. Hill actually threatened them with his weapon. The proper inquiry under W.R.E. 401 is whether the victims' responses to the alleged threat tend to prove or disprove the existence of the threat.

[¶32] We have considered the admissibility of victims' responses to an alleged threat in other cases. For example, in *Jensen*, the victim testified that she was "terrified" and stated: "I thought I was going to die. I thought my son was going to die." 2005 WY 85, ¶ 14, 116 P.3d at 1093. She also testified that she remembered her son "crying a lot." *Id.* The investigating officer, who arrived after the victim called 911 from a nearby convenience store, described her as "visibly upset," "shaking," crying, and "clinging to her child." *Id.* On appeal, Jensen claimed that because the elements of aggravated assault have nothing to do with the emotional state of the victims, this testimony was irrelevant and deprived him of his right to a fair trial. *Id.* We disagreed, holding:

> Jensen's theory of the case was that [the victim] was lying about the confrontation and that he had never threatened [the victim] or [her son], only himself. The testimony regarding the emotional state of [the victim] and [her son] during and in the immediate aftermath of the assault tends to disprove the assertion that [the victim's] accusations were calculated.

*Id.* at ¶ 17, 116 P.3d at 1094.

[¶33] Likewise, in *Gunderson*, we looked to the victim's state of mind and her reaction to the defendant's conduct as relevant evidence of a threat in determining the sufficiency of the evidence:

11

[The victim] further testified that she considered [defendant's] statement to be a personal threat toward her and that she believed her life was in danger. The fact that the victim got out of the car and ran across a field in her bare feet reinforces her statement that she believed she was actually being threatened.

We conclude that the jury reasonably inferred that [defendant's] actions with the gun constituted an actual threat[.]

925 P.2d at 1304.

[¶34] And, in *Johnston v. State*, 747 P.2d 1132 (Wyo. 1987), evidence of the victim's state of mind was considered in determining the sufficiency of the evidence to convict Mr. Johnston of aggravated assault. "Asked if [the victim] was acting in an aggressive way, his mother responded, 'He acted scared * * * he was just scared.' Even [another witness] testified that he felt threatened by having a knife pointed at him earlier in the affray." *Id*. at 1136.

[¶35] By contrast, in *Levengood*, the defendant challenged the sufficiency of the evidence on appeal. 2014 WY 138, ¶ 2, 336 P.3d at 1202. The trial court had admitted evidence of the victim's state of mind, some of which was favorable to the defendant. This Court stated that "[w]e are not concerned with the subjective reaction of the victim. Instead, we must objectively consider the actions of the defendant, and decide whether a rational trier of fact could infer [that there had been an actual threat]." *Id*. at ¶ 19, 336 P.3d at 1205. It is important to note that the question in *Levengood* was sufficiency of the evidence, and the standard of review for sufficiency of the evidence requires us to disregard evidence favoring the defendant. In *Levengood*, the victim's state of mind was favorable to the defendant and, therefore, our standard of review did not allow its consideration. Nevertheless, we held that the victim's testimony was not relevant to the question of whether there was an actual threat. *Id*.

[¶36] Our examination of the testimony of Officers Burlingame and Wright leads us to conclude that their testimony had some relevance under W.R.E. 401. Like the testimony in *Jensen*, *Gunderson*, and *Johnston*, the officers' testimony that they hid behind their vehicles is relevant to the existence of an actual threat. The objective actions taken by the officers in the immediate aftermath of the shot, such as taking cover behind their vehicles, were relevant to explain the unfolding events, and under our precedent may have been relevant to the question of whether the conduct of Mr. Hill posed an actual threat. We turn then to the question of whether evidence of the officers' actions was unduly prejudicial under W.R.E. 403.

12

[¶37] W.R.E. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This balancing test is assigned to "the sound discretion of the trial court." *Downing v. State*, 2011 WY 113, ¶ 4, 259 P.3d 365, 366 (Wyo. 2011); *Jennings v. State*, 806 P.2d 1299, 1305 (Wyo. 1991). "For us to conclude that a trial court abused its discretion in weighing evidence under W.R.E. 403, 'the appellant must show that the testimony has little or no value and that it was extremely inflammatory or introduced solely for the purpose of inflaming the jury.'" *Wimbley v. State*, 2009 WY 72, ¶ 20, 208 P.3d 608, 613 (Wyo. 2009) (quoting *Jennings*, 806 P.2d at 1305). The objective testimony of the officers concerning their actions in the aftermath of the first shot, when examined in context, was relevant to the question of whether there was an actual threat and did not put Mr. Hill at risk of being unfairly prejudiced.

[¶38] However, we agree that any probative value of the law enforcement officers' subjective fears is outweighed by the danger of unfair prejudice. Specifically, the following testimony is of very little probative value and presented a danger of unfair prejudice:

- "I felt threatened."

- "[T]hat's a police officer's worst nightmare."

- "I was in fear for my life."

- "You felt you were in danger? Absolutely."

- "I felt very threatened at the time. I think that's a police officer's worst nightmare. I guess I thought at one point in my short career – it may be over."

[¶39] The officers' testimony regarding their subjective fear has little or no relevance to the question of whether there was a threat, an element of the crime that does not require any specific response from the victim. As the Colorado Supreme Court has stated:

> Evidence that the victim was generally nervous and afraid after an alleged crime is not necessarily relevant to the question whether the crime was committed by the defendant. Even where the victim's state of mind is relevant for other purposes, such as whether a crime occurred, there is danger that the prejudicial character of the evidence may overshadow its probative value. CRE 403.

*People v. Haymaker*, 716 P.2d 110, 113 (Colo. 1986). Moreover, any probative value of this evidence is outweighed by the danger of unfair prejudice which lies in the possibility of a jury sympathizing with police officers who have placed their lives in danger for the protection of the public. *See People v. Blue*, 724 N.E.2d 920, 934 (Ill. 2000) (holding that garments of police officer "tip the evidentiary scale from items that are merely useful to those that are aimed directly at the sympathies, or outrage, of the jury. These are not just bloody clothes, but the clothes of a police officer, which . . . are uniquely 'charged with emotion.'"). The trial court's decision to allow that testimony was an abuse of discretion.

[¶40]  We now must determine whether that error was prejudicial. "Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made." *Toth v. State*, 2015 WY 86A, ¶ 29, 353 P.3d 696, 705-06 (Wyo. 2015) (citation omitted). In this instance, we cannot say Mr. Hill has established that the verdict might have been more favorable had this evidence not been admitted. The other evidence against Mr. Hill, including the high speed chase, his attempt to evade the officers, his disregard of the officers' commands for him to stop, his flight from the officers when he exited his vehicle, and the firing of his weapon, was overwhelming. As a result, we find that the error was not prejudicial.

### III.  Did the district court abuse its discretion when it denied Mr. Hill's motion for mistrial based upon prosecutorial misconduct?

[¶41]  Mr. Hill claims that the prosecutor engaged in prosecutorial misconduct in closing argument. The majority of the prosecutor's comments which Mr. Hill now claims amount to prosecutorial misconduct, formed the basis of defense counsel's motion for mistrial or new trial.

[¶42]  We review the denial of a motion for mistrial for abuse of discretion. *McGill v. State*, 2015 WY 132, ¶ 8, 357 P.3d 1140, 1444 (Wyo. 2015). An abuse of discretion occurs where the district court could not have reasonably concluded as it did. *Id.* at ¶ 8, 357 P.3d at 1144; *Yellowbear v. State*, 2008 WY 4, ¶ 66, 174 P.3d 1270, 1295 (Wyo. 2008); *Thomas*, 2006 WY 34, ¶ 10, 131 P.3d at 352; *Gunnett v. State*, 2005 WY 8, ¶ 15, 104 P.3d 775, 779 (Wyo. 2005).

> Boiled down to its essence, the process is this: (1) when a motion for mistrial or new trial is presented, the district court considers the motion and grants it if justice so requires; (2) justice requires that the motion be granted only if the appellant has been prejudiced because his or her substantial rights were abridged; (3) if the motion is denied, and that denial is appealed, we review that denial for an abuse of discretion; (4) abuse of discretion has occurred where the

district court could not have reasonably concluded as it did. ***With specific regard to claims of prosecutorial misconduct during closing argument, we consider the alleged misconduct in the context of the entire argument, and the entire record, with the determinative factor being whether, in the absence of the error, the verdict might have been more favorable to the accused.*** *Phillips v. State*, 2007 WY 25, ¶ 8, 151 P.3d 1131, 1133-34 (Wyo. 2007); *see also Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo. 2007); *Butcher v. State*, 2005 WY 146, ¶ 39, 123 P.3d 543, 554 (Wyo. 2005)[,*overruled on other grounds by Wilkerson v. State*, 2014 WY 136, 336 P.3d 1188 (Wyo. 2014)]; *Burton v. State*, 2002 WY 71, ¶¶ 11-12, 46 P.3d 309, 313 (Wyo. 2002).

*Yellowbear*, 2008 WY 4, ¶ 68, 174 P.3d at 1295-96 (emphasis added).

[¶43]   The prosecutor began his closing statement with the following:

Ladies and Gentlemen of the jury, we had some light moments during the last three days.  We had some references to things that we all thought were funny or humorous, but the bottom line is that this is a deadly serious case, deadly serious for the Tucker family, deadly serious for the law enforcement officers involved, ***deadly serious for the community***; and we need to look at all of the facts individually and look at the credibility of the witnesses.

(Emphasis added.)   The prosecutor also commented that Mr. Hill had "basically a war wagon that he is driving with two AKs and hundreds of rounds.  And he is cruising into town."

[¶44] Mr. Hill contends that the prosecutor's statements that the matter is "deadly serious for the community" and reference to the "war wagon" were improper because they raised a community outrage argument, which is prohibited. *See Gayler v. State*, 957 P.2d 855, 861 (Wyo. 1998) (recognizing that an appeal to jury to join the war on drugs by convicting the defendant was prosecutorial misconduct).

[¶45]   "The rule of law against community outrage arguments is clear and unequivocal.  'This Court has frequently admonished prosecutors to seek convictions by presenting evidence of guilt, rather than by arousing the passions and prejudices of jurors against societal evils.'" *Hernandez v. State*, 2010 WY 33, ¶ 23, 227 P.3d 315, 322-23 (Wyo. 2010) (citations omitted).

> Arguments which are calculated to appeal to the jury's prejudice or passion are improper because they pose a risk that the accused may be convicted for reasons wholly irrelevant to his guilt or innocence. Accordingly, it is improper for a prosecutor to encourage the jury to convict a defendant in order to protect the community rather than upon the evidence presented at trial.

*Burton*, 2002 WY 71, ¶ 15, 46 P.3d at 314 (citations omitted).

[¶46] The jury heard evidence that Mr. Hill had two assault weapons and hundreds of rounds of ammunition with him when the events in question transpired. In considering Mr. Hill's motion for mistrial, the district court noted that the "war wagon [statement] . . . is a strong statement, but there were two weapons with a lot of ammunition." While this statement did contain descriptive, colorful language, we cannot say that the district court abused its discretion in finding it was a reasonable summary of the evidence already before the jury. *See Yellowbear*, 2008 WY 4, ¶ 72, 174 P.3d at 1297 (allowing prosecutor to call defendant "father from hell" was not an abuse of discretion given the nature of the evidence). However, the district court did not address the comment that the war wagon was "cruising into town." That portion of the comment also was a true statement of the facts and standing alone it would not amount to a community outrage argument. However, in conjunction with the prosecutor's argument that the case is "deadly serious to the community," the statement that the war wagon was cruising into town does raise an improper community outrage argument. It was clearly a statement made to convince the jury that the entire town was in danger. It was prosecutorial misconduct to make that claim.

[¶47] The State concedes the statement that this case "is deadly serious to the community" was, indeed, prosecutorial misconduct, but argues that it did not result in material prejudice. The State also argues that the "war wagon" statement did not materially prejudice Mr. Hill. To determine whether Mr. Hill was prejudiced, we must evaluate these comments "in the context of the entire argument, and with reference to the entire record." *Hernandez*, 2010 WY 13, ¶ 25, 227 P.3d at 323. We are unable to conclude that these two comments, made in the beginning of closing argument, had the effect of persuading the jury to return a guilty verdict. Considering these comments in the context of the entire argument, and the entire record, including the evidence regarding Mr. Hill's confrontation with the Tucker family, his flight from law enforcement officers and the subsequent firing of his weapon, we are not convinced that, in the absence of the error, the verdict would have been more favorable to Mr. Hill. *See Yellowbear*, 2008 WY 4, ¶ 68, 174 P.3d at 1295-96. These comments, improper as they were, did not prejudice Mr. Hill and, as a result, do not warrant reversal. Accordingly, we conclude that the district court did not abuse its discretion in refusing to grant a mistrial on this basis.

[¶48] Next, Mr. Hill characterizes the prosecution's comments about two witnesses as improper vouching for the credibility of those witnesses. Because "[i]t is within the exclusive province of the jury to determine the credibility of the witnesses," it is improper for the prosecution or another witness to comment concerning the credibility of another witness. *McGill*, 2015 WY 132, ¶ 9, 357 P.3d at 1144; *see also Fennell v. State*, 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015).

[¶49] The first alleged improper vouching comment concerns the State's expert witness, Dr. Hamby. During closing, the prosecutor described Dr. Hamby as "one of the best witnesses that I have seen testify." The State concedes that this comment was prosecutorial misconduct, but argues that Mr. Hill was not prejudiced by the comment. We agree.

[¶50] Dr. Hamby was an expert witness called by the prosecution to testify regarding the capability of the assault rifle to fire accidentally. Dr. Hamby testified that the chances of firing three shots in fairly rapid succession accidentally with Mr. Hill's firearm are "nil because it would . . . require pulling the trigger three times in order to discharge it three times." This evidence became largely irrelevant because when Mr. Hill testified, he explained that he fired a second series of three rapid shots, not because he fell and accidentally fired them (which he had originally told one of the officers after his arrest), but because he saw "perhaps a skunk" and he fired at it on the "spur of the moment." Dr. Hamby also testified that when a person who sees muzzle flash from a gun like the one used by Mr. Hill fire at night, it does not necessarily mean that the gun is pointed at the person because, while the majority of the flash will come out of the barrel of the gun, some would also probably come out the side. This testimony was at least arguably helpful to Mr. Hill, who had contended that his rifle was pointed toward the ground and not in the direction of the law enforcement officers when the first shot went off.

[¶51] Mr. Hill was not prejudiced when the prosecution improperly vouched for Dr. Hamby because he was a witness whose testimony was largely irrelevant and potentially helpful to Mr. Hill. The district court did not abuse its discretion in denying Mr. Hill's motion for mistrial on improper vouching for Dr. Hamby.

[¶52] Mr. Hill also contends that the prosecutor improperly vouched for Mrs. Tucker. During his closing argument, the prosecutor stated: "[Mrs. Tucker] felt threatened for her family. She explained that threat on the stand very well." The State asserts that this comment did not amount to vouching, but rather was an argument that Mrs. Tucker felt threatened by Mr. Hill's actions.

[¶53] The law is "clear that a prosecutor cannot personally vouch for the credibility of a state's witness." *Fennell*, 2015 WY 67, ¶ 31, 350 P.3d at 722. In *Dysthe v. State*, 2003 WY 20, ¶¶ 28-30, 63 P.3d 875, 886 (Wyo. 2003), we found improper vouching in the prosecutor's comment that "[t]hese witnesses, despite the fact that they are users, were

credible. They were very credible." Similarly, in *Browder v. State*, 639 P.2d 889, 894-95 (Wyo. 1982), we found a series of statements by the prosecutor to be improper vouching, including the prosecutor's statements that if you believe the inference made by the defense that there was a deal made, "you have to throw me out as a liar because I said it then and he said it and it's not so. Not so[,]" and "I thoroughly believe her story." And we have held that it is "unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant." *Id.* at 893 (quoting ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-5.8 (1980)).

[¶54] The prosecutor's comment that Mrs. Tucker "explained that threat very well on the stand" does not rise to the level of improper vouching. During the trial, Mr. Hill's counsel questioned Mrs. Tucker regarding her 911 call. He stressed the fact that Mrs. Tucker never told the 911 operator that they were being threatened.

[¶55] This line of questioning raised the issue of whether Mrs. Tucker's failure to tell the 911 dispatcher that she was threatened meant that she did not feel threatened at the time.[2] Prosecutors may properly review the evidence that was admitted at trial and may suggest to the jury inferences based upon that evidence. *Browder*, 639 P.2d at 893. In this instance, the prosecutor was not communicating his belief that Mrs. Tucker was a credible witness or that she was telling the truth; rather, he was making the point that Mrs. Tucker's testimony described the threat that she felt Mr. Hill posed to her family. The district court's refusal to grant a mistrial on the basis of that comment was, therefore, not an abuse of discretion.

[¶56] Finally, Mr. Hill argues that during closing argument the prosecutor misstated the testimony of Deputy Schwindt. During closing, the prosecutor argued:

> Deputy Schwindt's testimony was clear. Five to ten seconds out, he has -- he can see the defendant, and he can see the defendant turn towards them and he can see the muzzle blast.
>
> So in determining the credibility of witnesses you need to compare that testimony, Deputy Schwindt's testimony, that he saw the muzzle blast. He saw the gun pointed in this direction towards the law enforcement officers and it go off.

---

[2] Mr. Hill's conduct with respect to the Tucker family led to reckless endangering charges, in violation of Wyo. Stat. Ann. § 6-2-504(b) (LexisNexis 2015). Mr. Hill did not object to the admissibility of the evidence of Mrs. Tucker's subjective feelings of being threatened with respect to those charges and we will not consider the question here.

Mr. Hill argues that this summary of Deputy Schwindt's testimony was an improper misstatement of the evidence because Deputy Schwindt never stated that he saw the gun pointed toward the law enforcement officers.

[¶57] Deputy Schwindt actually testified: "He turned slightly back towards our direction. I will say 'our.' And I heard -- well, I saw a muzzle flash come from the end of the rifle and then a report, or the sound of the shot." He also had the following exchange:

> Q. [State's Counsel]: And specifically again, what did you see that person do?
>
> A. [Deputy Schwindt]: As he approached the rise, you mean?
>
> Q. Yes.
>
> A. Right at, I would say, approximately the top of the rise, I just saw the rifle come slightly back and . . .
>
> Q. Back in what direction?
>
> A. Towards our -- towards our direction, as opposed to being directly away.
>
> Q. Okay. So the person stopped; is that correct?
>
> A. I can't say he stopped.
>
> Q. Okay.
>
> A. He appeared to keep running, which -- but the rifle, from where I had seen it be in more of, I guess, in a way manner come back slightly toward our direction. Then I saw the muzzle flash.

[¶58] The discrepancy between the prosecutor's summary of Deputy Schwindt's testimony and Deputy Schwindt's actual testimony appears in the word "slightly" used by Deputy Schwindt to describe the direction the rifle was pointed. As we have stated: "In analyzing claims of prosecutorial misconduct, we review the entire context of the prosecutor's statements, as well as the trial testimony and evidence to determine whether the prosecutor's review of the evidence and comments about it were unsubstantiated by

the record." *James v. State*, 888 P.2d 200, 207 (Wyo. 1994). The district court concluded that the prosecutor's summary was consistent with Deputy Schwindt's testimony: "[w]ith respect to Officer Schwindt, that's how I understood his testimony, was that it may not have been pointed directly, but it was pointed back in the general direction." We agree. The prosecutor's summary of the evidence is substantiated by the record. The district court did not abuse its discretion when it found no misconduct occurred.

## IV. Did the prosecutor's comments during closing misstate the law, or constitute improper vouching?

[¶59] Mr. Hill also takes issue with the prosecutor's statements during closing regarding what constitutes a threat, his comparison between Mr. Hill's and Mr. Tucker's testimony, and his comments as to Mr. Hill's credibility. No objections were made during trial regarding these instances of alleged prosecutorial misconduct. We therefore review them for plain error. *Collins v. State*, 2015 WY 92, ¶¶ 9-10, 354 P.3d 55, 57 (Wyo. 2015); *Fennell*, 2015 WY 67, ¶ 23, 350 P.3d at 719; *Anderson v. State*, 2014 WY 74, ¶ 40, 327 P.3d 89, 99 (Wyo. 2014). "Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Collins*, 2015 WY 92, ¶ 10, 354 P.3d at 57 (citation omitted). "Reversal as a result of prosecutorial misconduct is not warranted unless a reasonable probability exists that absent the error the defendant may have enjoyed a more favorable verdict." *Oldman*, 2015 WY 121, ¶ 13, 359 P.3d at 970 (citation omitted). "Allegations of prosecutorial misconduct are settled by reference to the entire record and 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.'" *Gonzalez-Ochoa v. State*, 2014 WY 14, ¶ 15, 317 P.3d 599, 604 (Wyo. 2014) (quoting *Schreibvogel v. State*, 2010 WY 45, ¶ 39, 228 P.3d 874, 887 (Wyo. 2010)).

[¶60] Mr. Hill argued that the prosecutor misstated the law when he said the following:

> All the officers' testimonies state that they saw the weapon in his hands during his attempt to flee. But threaten to use, there is no better way to exhibit the threat than to actually use the weapon. In this case Mr. Hill was armed and willing to use the weapon. He fired the weapon. And that satisfies the element of threatening to use a drawn deadly weapon. There is absolutely no evidence before the Court or before the jury that those shots were in defense of anything.

[¶61] Mr. Hill has met the first prong of the plain error test because the incident alleged as error is plainly reflected in the transcript of the trial. The second prong requires us to examine whether there has been a violation of a clear and unequivocal rule of law. We

have said that "[c]ounsel are allowed wide latitude during the scope of their closing arguments, and a prosecutor may comment on all of the evidence in the record and suggest reasonable inferences from that evidence." *Lindstrom v. State*, 2015 WY 28, ¶ 32, 343 P.3d 792, 800 (Wyo. 2015) (citation omitted). However, "[e]ven unintentional misstatements of the law are misconduct by a prosecutor." *Anderson*, 2014 WY 74, ¶ 39, 327 P.3d at 99.

[¶62] Mr. Hill argues that the statement by the prosecution that the fact the shot was fired satisfies the element of a threat was a violation of the rule prohibiting prosecutors from misstating the law. Mr. Hill contends that there are numerous situations in which the mere firing of a shot, in and of itself, would not constitute a threat and, as a result, this statement was a violation of the law. The State contends this language was not a statement of the law at all, but, rather, it was argument that firing an assault rifle while attempting to flee pursuing officers is a threat to use that weapon against the officers. We agree.

[¶63] The prosecutor was only arguing that the evidence in the case satisfied the element of "threatening to use a drawn deadly weapon," rather than making a statement of law. This is not a case like *Anderson*, 2014 WY 74, ¶ 38, 327 P.3d at 99, where the prosecutor attempted to restate and explain the law. Here the prosecutor was properly arguing that the evidence satisfied the elements of the crime charged. The fact that a weapon was fired was evidence that the jury could consider in the context of all the evidence when it determined whether an actual threat existed. The prosecutor's statement did not stand alone as a statement of the law, but was preceded by reference to the officers' testimony of the gun in Mr. Hill's hand as he attempted to flee, and followed by the statement that there was no evidence "those shots were in defense of anything." In that context, the prosecutor was merely making a closing argument about the sufficiency of the evidence. He did not misstate the law and no prosecutorial misconduct occurred.

[¶64] Mr. Hill also contends that the prosecutor invaded the province of the jury when he pointed to discrepancies between Mr. Hill's and Mr. Tucker's testimony and when he commented on Mr. Hill's credibility. Mr. Hill has met the first prong of the plain error test because the incidents alleged as error are plainly reflected in the transcript of the trial. Mr. Hill takes issue with the prosecutor's statement that "Mr. Tucker's testimony is in conflict with Mr. Hill's testimony. Mr. Tucker's testimony is accurate and reflects what was recovered at the Red Lake area, State's Exhibit No. 8." That statement was made during the course of the prosecutor's discussion of the evidence concerning where the rifle was in Mr. Hill's car:

Next, he says that he never raised the firearm above his legs. He places the firearm between his legs but never raises it up. That is inconsistent with Mr. Tucker's testimony,

21

because Mr. Tucker says, Yeah, I saw a gun that was on the dashboard. It was pointed in our direction, and I can say it was a semiautomatic type rifle. In fact, I think it was probably like an AK rifle.

So Mr. Tucker's testimony is in conflict with Mr. Hill's testimony. **Mr. Tucker's testimony is accurate** and reflects what was recovered at the Red Lake area, State's Exhibit No. 8 [the AK-74 rifle]. So you have that inconsistency.

(Emphasis added.)

[¶65] Mr. Hill also points to the following comments made by the prosecutor:

- "So let's assume that [Mr. Hill] was being harassed by the Tuckers, **which is not the case**, but let's assume that, what would rational behavior be? Get out of there. Get out of there as fast as he could."

- "I think that it is very interesting that Mr. Hill when he testified talked about shooting a skunk, because, quite **frankly, his version of events stink. They stink. And they're not credible.**"

- [Mr. Hill's] version of events that he testified to are **not consistent with reality** in some instances. They are not consistent with certainly credible evidence.

(Emphasis added.)

[¶66] As we explained above, *see supra* ¶ 53, a prosecutor may not personally vouch for the credibility of a witness. *Fennell*, 2015 WY 67, ¶ 31, 350 P.3d at 722; *Dysthe*, 2003 WY 20, ¶¶ 28-30, 63 P.3d at 886; *Browder*, 639 P.2d at 894-95. However, "[i]n the context of closing argument, it has long been the rule in Wyoming that it is not reversible error for a prosecutor to argue that a defendant is a liar when the evidence supports a reasonable inference that such is in fact the case." *Collins*, 2015 WY 92, ¶ 34, 354 P.3d at 64.

[¶67] In *Collins*, the defendant argued that it was plain error for the prosecutor to tell the jury that it had a choice between finding the defendant guilty or concluding that the child witness in that case had lied. *Id*. at ¶ 33, 354 P.3d at 64. We held that the comment had not violated a clear and unequivocal rule of law because the prosecutor made "it clear that the choice is in the hands of the jury." *Id*. at ¶ 34, 354 P.3d at 64. In *Barela v. State*, 787 P.2d 82, 84 (Wyo. 1990), the prosecutor stated:

22

> People can lie in Court and people do lie in Court. . . . If you lie long enough, and you lie, and you keep up with this story, and I contend that this is a story that Mr. Barela made up, you will lie. . . . He lied throughout this, the court proceeding, and he has a real motive to lie.

On review for plain error, we concluded:

> When these statements are read in the context of the complete argument, it is apparent that the prosecutor was not attempting to induce the jury to base their factual determination on his beliefs or opinions. Rather, he was articulating the State's position upon inferences to be drawn from the evidence. It was argument pure and simple. The prosecutor was careful to make it clear that the decision was in the hands of the jury. As to the statement that defendant was lying, when there is express contradictory testimony, as there was here, the inference that at least one of the witnesses is lying is a reasonable one.

*Barela*, 787 P.2d at 84.

[¶68] Likewise, here, the prosecutor made it clear in his argument that he was pointing to contradictions in the testimony of Mr. Hill and others, and that the jury would have to examine those inconsistencies. Mr. Hill's testimony conflicted with Mr. and Mrs. Tucker's testimony and it was not improper for the prosecutor to point out areas of conflict and argue why one version of the events that took place was more believable than another. In short, the comments made by the prosecutor were argument supported by the evidence. As a result, he did not violate a clear and unequivocal rule of law.

## *CONCLUSION*

[¶69] There was sufficient evidence for a jury to have rationally concluded that Mr. Hill threatened to use a drawn deadly weapon on the three law enforcement officers who were on the scene when he emerged from his vehicle. While the district court abused its discretion when it admitted evidence of law enforcement officers' subjective responses to a fired shot, that error was not prejudicial. The district court did not abuse its discretion in denying Mr. Hill's motion for mistrial. Finally, the prosecutor's statements during closing regarding what constitutes a threat, his comparison between Mr. Hill's and Mr. Tucker's testimony, and his comments regarding Mr. Hill's credibility did not constitute plain error. We affirm Mr. Hill's conviction.

23