# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 85

APRIL TERM, A.D. 2016

August 29, 2016

MIRANDA ROSE MRAZ,

Appellant
(Defendant),

v.                                                   S-15-0175

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sheridan County*
*The Honorable John G. Fenn, Judge*

*Representing Appellant:*
    Office of the State Public Defender:  Diana Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; and Kirk A. Morgan, Senior Assistant Appellate Counsel.  Argument by Mr. Morgan.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; and Caitlin F. Young, Assistant Attorney General.  Argument by Ms. Young.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**HILL,** Justice.

[¶1]  A jury convicted Miranda Mraz of seven counts of felony forgery and one count of misdemeanor theft arising out of charges that as a server at a restaurant she altered credit card receipts to increase the amount of her tips.  On appeal, Ms. Mraz asserts that her conviction should be reversed on grounds of vindictive prosecution, ineffective assistance of counsel, prosecutorial misconduct, failure to provide supplemental instructions to the jury, and insufficiency of the evidence.  We affirm.

## ISSUES

[¶2]  Ms. Mraz states the issues on appeal as follows:

> I.  Were Ms. Mraz's due process rights violated as her prosecution was motivated by prosecutorial vindictiveness?
> II.  Was Ms. Mraz provided effective assistance of counsel?
> III.  Was Ms. Mraz denied her right to a fair trial when the prosecutor in closing argument argued facts not in evidence?
> IV.  Did the district court commit reversible error when it failed to provide a substantive answer of a question of law asked during jury deliberation?
> V.  Was the evidence insufficient to support a conviction for forgery or misdemeanor theft?

## FACTS

[¶3]  In 2013, Ms. Mraz began working at the Trails End Motel in Sheridan, Wyoming.  Ms. Mraz worked first in housekeeping and then was promoted to server in the motel's restaurant, the Firewater Grill.  In November 2013, a customer contacted Robert Romeo, the assistant general manager of the Trails End Motel and Firewater Grill, and complained that he had been overcharged for a tip he left on a credit card payment to the Firewater Grill that month.  Mr. Romeo looked into the customer's complaint and verified that the customer had been overcharged.  Mr. Romeo then reported what he had found to Robert Green, the general manager who supervised operations at the Firewater Grill.

[¶4]  Upon learning of the overcharge, Mr. Green directed Mr. Romeo to review the transactions for all the restaurant's servers during that same month to ensure this type of overcharge was not occurring frequently.  After completing that

1

review, Mr. Romeo reported to Mr. Green that he had found additional credit card transactions that were altered and that while one of the transactions involved a customer served by a server other than Ms. Mraz, the other several transactions involved customers served by Ms. Mraz. Mr. Green and Mr. Romeo both met with Ms. Mraz at this point and informed of her of what they had found. Ms. Mraz denied any wrongdoing in relation to the transactions.

[¶5]    Following their meeting with Ms. Mraz, Mr. Green directed Mr. Romeo to broaden his investigation to include another month's worth of credit card transactions. Mr. Romeo completed his review of the additional transactions and reported to Mr. Green that he found additional altered transactions and all of them were for customers served by Ms. Mraz. Mr. Green and Mr. Romeo then met with Ms. Mraz and terminated her employment.

[¶6]    On February 19, 2014, Officer Daniel Keller of the Sheridan Police Department conducted an alcohol compliance check at the Firewater Grill. During an alcohol compliance check, two officers in plain clothes accompany an under-aged person into a bar and have that person attempt to buy alcohol. After completing the compliance check, Officer Keller reported the results of the compliance check to Mr. Green. During that conversation, Mr. Green asked Officer Keller about reporting the altered credit card transactions involving Ms. Mraz. Officer Keller advised Mr. Green that he could not take his report at that time because he was there solely for the purpose of the compliance check, but he urged Mr. Green to call the police department and report the matter.

[¶7]    On February 21, 2014, Officer Keller returned to the Firewater Grill after finding that no report had been called in. On that date, Officer Keller spoke with Mr. Romeo about the allegations against Ms. Mraz, and Mr. Romeo turned over the documents gathered in his review of the credit card transactions involving customers served by Ms. Mraz. Officer Keller then turned the documents over to the detectives division of the Sheridan Police Department.

[¶8]    On May 29, 2014, the State filed an information against Ms. Mraz charging her with six counts of felony forgery for the alteration of credit card receipts and one count of misdemeanor theft, all relating to the transactions at Firewater Grill. On June 13, 2014, the State filed an amended information, which added a count of felony forgery. On March 2, 2015, following a seven-day trial, a jury returned a verdict finding Ms. Mraz guilty of all seven counts of felony forgery and the one count of misdemeanor theft. On June 5, 2015, the district court entered its judgment and sentence. The court sentenced Ms. Mraz to serve eighteen to thirty months in prison on each of the seven counts of felony forgery, to be served concurrently, and suspended those sentences in favor of three years of supervised probation. On the single count of misdemeanor theft, the court sentenced Ms.

Mraz to serve thirty days in jail and suspended that sentence in favor of six months supervised probation, to be served concurrent to the probation for the forgery convictions. On July 2, 2015, Ms. Mraz filed her timely notice of appeal to this Court.

## DISCUSSION

[¶9] Ms. Mraz presents her sufficiency of the evidence challenge as her final claim of error on appeal. Because our discussion of the evidence supporting Ms. Mraz's conviction may be helpful in our discussion of Ms. Mraz's other claims of errors, we will consider the sufficiency of the evidence claim first. We will then address Ms. Mraz's remaining claims of error in the order presented.

### A.    Sufficiency of the Evidence

### 1.    Background

[¶10] Because our consideration of Ms. Mraz's sufficiency of the evidence claim requires an understanding of how servers at the Firewater Grill handle transactions with the customers they serve, we will begin our discussion there. More particularly, the jury was provided with detailed testimony on the restaurant's system for processing, recording and tracking customer transactions, and we briefly summarize that background below.

[¶11] The first piece of background information is the Firewater Grill's system for processing and tracking customer transactions. The Firewater Grill uses a point of sale computer program called Maitre 'D, which was also the system in use when Ms. Mraz worked as a server at Firewater Grill. Each server has a server ID, which is a specific number assigned to that server that allows the server to log into the system. The server uses his/her server ID to: sign into the system with a status that allows the server to wait on tables; open a table and assign the table to a server; to record the number of customers at a table; place and record orders for a table; generate a bill to give to a customer; process cash and credit/debit card payments by a customer; and finalize any transaction with a customer.

[¶12] Using the Maitre 'D system, the first thing a Firewater Grill server must do upon arriving at work is sign into the system using his/her server ID. [After a customer arrives and is seated, the server enters his/her server ID, enters the table number, and enters the number of customers at the table. After taking any orders from a table, the server then enters that additional information into the system. After customers inform a server that no additional service is required, the server, again using his/her server ID, opens the check for that table on the system and prints the check.

3

[¶13]  The check generated by Maitre 'D will show the table number, the details of the order, the order total, the date and time the check was printed, the server ID number, and the server's name.  If a customer pays with a credit/debit card, the server again opens the ticket in the system, runs the card through the system, and then prints merchant and customer copies of the credit/debit card receipt.  The merchant copy provides a line for a customer to enter a tip amount and a line for the customer's signature.  After the customer signs the merchant copy, it is returned to the server, and the server, again using his/her server ID number, finalizes the transaction by entering into the system the total amount paid, including the tip.

[¶14]  The second piece of background information that is important to our consideration of Ms. Mraz's sufficiency of the evidence claim is the manner in which a Firewater Grill server handles cash and receipts received from customers during the server's shift.  The restaurant's servers use a system called "server banking."  This means the server is the bank for a table.  If a customer pays in cash, the server makes change for the customer from cash the server is holding.  If the server does not have the denominations needed to make the change, the server will take the larger bills given by the customer to a bartender or the motel's front desk and have the larger bill broken into smaller bills that will allow the server to make change.  The server keeps all cash paid by customers and all receipts, including both credit/debit card and cash receipts, on his/her person until the end of the server's shift.

[¶15]  At the end of a server's shift, the server uses the Maitre 'D system to prepare a document entitled "Summary of Sales."  The Summary of Sales totals all of the server's transactions from the start of a shift to the end of the shift.  Drawing data from each transaction entered by the server during the shift, the system generates a summary that shows total sales and total number of tables and customers served.  The summary separates out totals for cash transactions and credit/debit card transactions and totals the tips left by credit/debit card.  The summary also displays a detailed report that separates out the meal cost and tip for each table served by that server.

[¶16]  After a server prepares and prints the Summary of Sales document, the server generally signs the document.  The server then submits the Summary of Sales document to the bartender on duty, along with all receipts collected during the shift.  The server must also give the bartender the server's net deposit for the shift. The net deposit is equal to the server's total cash sales for the shift less any tips left by credit/debit card.  If cash sales exceed the server's credit/debit card tips, the server will turn over the remaining cash to the bartender.  If the cash sales are less than the server's credit/debit card tips, the bartender will take cash from

4

the till to give to the server to make up the difference. Once the net deposit is resolved with the bartender, the server will have received cash for all credit/debit card tips left to the server during that shift.

[¶17] With this background, we turn to our standard of review and analysis of Ms. Mraz's sufficiency of the evidence claim.

## 2. Standard of Review

[¶18] In reviewing a claim that the evidence was insufficient to support a guilty verdict:

> [w]e examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial.

*Bean v. State*, 2016 WY 48, ¶ 44, 373 P.3d 372, 386 (Wyo. 2016) (quoting *Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738–39 (Wyo. 2012)).

[¶19] We have further said:

> We do not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder." *Hill v. State*, 2016 WY 27, ¶ 13, 371 P.3d 553, 558 (Wyo.2016) (citing *Levengood v. State*, 2014 WY 138, ¶ 12, 336 P.3d 1201, 1203 (Wyo.2014)). "We will not reweigh the evidence nor will we re-examine the credibility of the witnesses." *Hill*, 2016 WY 27, ¶ 12, 371 P.3d at 558 (citation omitted). We review the sufficiency of the evidence "from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Oldman*, 2015 WY 121, ¶ 5, 359 P.3d at 966.

*Bean*, ¶ 45, 373 P.3d at 387.

## 3.    <u>Analysis</u>

[¶20]  Ms. Mraz was convicted of seven counts of felony forgery, in violation of Wyo. Stat. Ann. § 6-3-602, and one count of misdemeanor theft, in violation of Wyo. Stat. Ann. § 6-3-402.  Ms. Mraz argues the evidence was insufficient to support these convictions because the State was able to prove only that Ms. Mraz had the opportunity to commit the crimes, and opportunity evidence without corroboration cannot sustain a conviction.

[¶21]  We have indeed held that evidence of opportunity alone is insufficient to support a conviction.  *Mraz v. State*, 2014 WY 73, ¶ 15, 326 P.3d 931, 935-36 (Wyo. 2014) (citing *State v. Morris*, 283 P. 406, 414 (Wyo. 1929); *Jozen v. State*, 746 P.2d 1279, 1283 (Wyo. 1987); *Smizer v. State*, 752 P.2d 406, 411 (Wyo. 1988); *Fischer v. State*, 811 P.2d 5, 8 (Wyo. 1991).  The record must contain additional evidence, such as the defendant's possession of the stolen property, a motive to commit the crime, an attempt to avoid apprehension, or some other direct link to the crime.  *Mraz*, ¶ 16, 326 P.3d at 936.  We thus agree with Ms. Mraz's premise that opportunity evidence alone cannot sustain a conviction. Based on our record review, however, we find sufficient corroborating evidence to support the jury's verdict.

[¶22]  The forgery convictions related to transactions in which Ms. Mraz was alleged to have made written alterations to the amount of the tip written on the credit/debit card receipt by the customer.  For each of those transactions, the State presented, at a minimum: the merchant copy of the receipt showing the alteration; the testimony of the customer confirming that the customer's writing on the receipt had been altered; the Summary of Sales showing both that Ms. Mraz was the server and that the amount of the credit/debit card tip she was due was the amount inflated by the alteration; and labor reports from the motel and restaurant showing that Ms. Mraz signed off duty shortly after generating the Summary of Sales report.

[¶23] To summarize, the State presented evidence that a server prepares a Summary of Sales at the end of the server's shift and then settles up with the bartender.  In the course of that settling up, the server is essentially given cash in exchange for amounts shown on the Summary of Sales as credit/debit card tips and is thus left with cash in his or her pocket based on the amount of the credit/debit card tips shown on the Summary of Sales.  For each of the seven transactions for which Ms. Mraz was found guilty of forgery, the Summary of Sales showed that the credit/debit card tips for which Ms. Mraz would have

received cash when she settled up with the bartender were the tips inflated by the receipt alterations. Additionally, the evidence showed that the Summary of Sales documents associated with these seven transactions were prepared under Ms. Mraz's server ID and were run at the end of a shift she in fact worked. Finally, the State also presented evidence that Ms. Mraz never complained to management that she was not receiving cash for the credit/debit card tips recorded on the Summary of Sales. From all of this evidence, the jury could reasonably infer that Ms. Mraz received cash in the amount of the inflated tips, which is evidence that corroborates the State's opportunity evidence.

[¶24] With respect to the theft counts, the State presented evidence on two theories of how Ms. Mraz committed the charged thefts. For fourteen transactions, the State alleged Ms. Mraz committed theft by adding an 18% gratuity to the ticket in violation of restaurant policy. In those transactions, Ms. Mraz added the gratuity before the ticket was given to the customer but without informing the customer of the added charge, resulting in inflated tips ranging from 21% to 47% of the meal cost. The jury found Ms. Mraz not guilty of theft with respect to each of those theft charges, and we therefore need not concern ourselves with the evidence supporting those charges.

[¶25] The theft charges on which the jury did return a guilty verdict consisted of transactions in which the State alleged Ms. Mraz increased the amount of the tip authorized by the customer when she charged the customer's credit/debit card. There were ten of these transactions and they resulted in inflated tips ranging from 15.5% to 82.3% of the meal cost. For all but two of these transactions, the State submitted, at a minimum, the merchant or customer copy of the credit/debit card receipt showing the amount of the tip authorized by the customer, the Summary of Sales prepared under Ms. Mraz's server ID number and showing the increased tip charged against the card, and a labor report showing that Ms. Mraz checked out of work shortly after the Summary of Sales was prepared. With respect to two of the transactions, the State did not introduce corresponding labor reports showing Ms. Mraz checked out of work shortly after preparing the Summary of Sales documents. The State did, however, introduce the associated Summary of Sales documents, and those documents were signed by Ms. Mraz.

[¶26] As with the forgery charges, the State's evidence to support the theft charges included the Summary of Sales documents, which for each of the transactions recorded inflated credit/debit card tips for which Ms. Mraz would have received cash when she settled up with the bartender at the end of her shift. From this evidence, the jury could again reasonably infer that Ms. Mraz received cash in the amount of the inflated tips. This evidence corroborated the State's opportunity evidence and was sufficient to support the jury's verdict.

7

## B. Vindictive Prosecution

[¶27] In 2012, in a case unrelated to the present appeal, Ms. Mraz was charged with one count of larceny by bailee in relation to money that went missing from the safe of her then employer, the Sheridan, Wyoming Eagles Club. On February 16, 2013, a jury found Ms. Mraz guilty of the charged larceny. After the district court entered its judgment and sentence on the larceny conviction, Ms. Mraz appealed the conviction. On June 10, 2014, this Court reversed Ms. Mraz's larceny conviction, finding that it was not supported by sufficient evidence. Thereafter, on August 4, 2014, the district court entered a judgment of acquittal on the larceny charge.

[¶28] Ms. Mraz now asserts that the State's prosecution of her for forgery and theft was in retaliation for her successful appeal of her 2013 larceny conviction. She contends that the State's allocation of substantial prosecutorial resources to crimes that resulted in only minor monetary losses to the victims is evidence of the State's retaliatory motive and that her present conviction must therefore be overturned as a vindictive prosecution in violation of her due process rights. We find no support for Ms. Mraz's claim in the record or in the law.

### 1. Standard of Review

[¶29] Under our usual standard of review for a claim of vindictive prosecution, we treat the issue as a mixed question of law and fact. *Merchant v. State*, 4 P.3d 184, 193 (Wyo. 2000). We defer to the trial court's factual findings relating to the claim unless those findings are clearly erroneous, and we review the court's legal determinations *de novo. Id.*; *see also United States v. Sarracino*, 340 F.3d 1148, 1177 (10th Cir. 2003) ("This court reviews the district court's factual findings on prosecutorial vindictiveness for clear error, and reviews *de novo* its legal conclusions."); *United States v. Raymer*, 941 F.2d 1031, 1039 (10th Cir. 1991) ("Vindictive prosecution claims often turn on the facts, and we review a district court's factual findings under the clearly erroneous standard; our review of the legal principles which guide the district court is *de novo.*"). Neither Ms. Mraz nor the State indicates in their briefing that the vindictive prosecution claim was presented to the district court in a motion to dismiss, or otherwise, and in our review of the record we are unable to find that the claim was raised before the district court. We therefore forego our usual standard of review and confine our review to a search for plain error.

[¶30] To establish plain error, an appellant "must establish by reference to the record that a clear and obvious violation of a clear and unequivocal rule of law adversely affected a substantial right to such a degree that [the appellant] was materially prejudiced." *Vaught v. State*, 2016 WY 7, ¶ 14, 366 P.3d 512, 516

(Wyo. 2016); *see also Butler v. State*, 2015 WY 119, ¶ 16, 358 P.3d 1259, 1264 (Wyo. 2015).

## 2.  **Analysis**

[¶31] To establish a claim for vindictive prosecution, a defendant must prove either actual vindictiveness or conduct that raises a presumption of vindictiveness. We have explained:

> A defendant has the burden of proof and must establish either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons. If the defendant does not meet his burden of proof, however, the district court need not reach the government justification issue.

*Lopez v. State*, 2006 WY 97, ¶ 21, 139 P.3d 445, 453 (Wyo. 2006) (quoting *Whiteplume v. State*, 874 P.2d 893, 896 (Wyo. 1994)).

## a.  *Actual Vindictiveness*

[¶32] Actual vindictiveness is a difficult showing to make.  One court summarized the required showing:

> To establish actual vindictiveness, the defendant must demonstrate: "(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir.2001). "To find 'actual vindictiveness requires direct evidence, such as evidence of a statement by the prosecutor, which is available only in a rare case.'" *United States v. Johnson*, 221 F.3d 83, 94 (2d Cir.2000) (quoting *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir.1999))(internal quotation marks omitted). "'To establish vindictive prosecution, a defendant must show that the prosecutor has some personal 'stake' in deterring the defendant's exercise of his constitutional rights, and that the prosecutor's conduct was unreasonable.'" *United States v. Wade*,

266 F.3d 574, 585 (6th Cir.2001) (quoting *United States v. Wells*, 211 F.3d 988, 1001–02 (6th Cir.2000)). Because an actual vindictiveness contention requires objective evidence that the prosecutor's actions were designed to punish the defendant for asserting his legal rights, such allegations are "exceedingly difficult" to establish. *United States v. Gary*, 291 F.3d 30, 34 (D.C.Cir.2002) (quoting *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C.Cir.2001)) (internal quotation marks omitted).

*United States v. Rodella*, 59 F.Supp.3d 1331, 1350-51 (D. New Mexico 2014).

[¶33] Ms. Mraz makes little effort to show actual vindictiveness, citing only the fact that she appealed her larceny conviction and she was months later charged in the present matter. This does not suffice to show actual vindictiveness, and we otherwise find no clear and unequivocal evidence of actual vindictiveness such as would be required to support a finding of plain error.

### b.    *Presumption of Vindictiveness*

[¶34] Our next determination must be whether Ms. Mraz has shown facts that will give rise to a presumption of vindictiveness and shift the burden to the State to justify its decision to prosecute with "legitimate, articulable, objective reasons." *Lopez*, ¶ 21, 139 P.3d at 453. We have described the circumstances under which such a presumption will arise:

> Where a defendant has exercised a legal right and the government responds in a way that punishes him for taking such action, an improper vindictive motive is presumed. *United States v. Goodwin*, 457 U.S. 368, 373–74, 102 S.Ct. 2485, 2488–89, 73 L.Ed.2d 74 (1982). The presumption arises when the government acts by imposing increased charges, such as changing a charge from a misdemeanor to a felony or subjecting him to the possibility of greater sentence or in some other way "upping the ante." *Blackledge v. Perry*, 417 U.S. 21, 28, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

*Lopez*, ¶ 21, 139 P.3d at 453 (quoting *Phillips v. State*, 835 P.2d 1062, 1070 (Wyo. 1992)).

10

[¶35] The United States Supreme Court has explained the reason for the presumption and the caution with which the presumption must be used.

> \* \* \* Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to "presume" an improper vindictive motive. Given the severity of such a presumption, however—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the Court has done so only in cases in which a reasonable likelihood of vindictiveness exists.

*United States v. Goodwin*, 457 U.S. 368, 373, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982).

[¶36] In keeping with this cautionary approach to finding a presumption of a vindictive motive, we have stated:

> [I]n determining whether there exists a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness, we look beyond the subjective appearance and ask whether, "as a practical matter, there is a realistic likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right."

*Whiteplume*, 874 P.2d at 896 (quoting *United States v. Raymer*, 941 F.2d 1031 at 1042 (10th Cir. 1991)).

[¶37] We have also held that requiring a defendant to take responsibility for each criminal act in an episode, following successful appeal, does not constitute vindictive prosecution. *Lopez*, ¶ 21, 139 P.3d 453 (citing *Phillips*, 835 P.2d at 1070). Given that we will not recognize a presumption of vindictiveness where a defendant is charged with separate criminal acts arising out of the same facts that were involved in that defendant's successful appeal, we can discern no basis for recognizing a presumption where a defendant successfully appeals one conviction and is subsequently charged with an entirely different crime arising out of an entirely different set of circumstances.

[¶38] In ruling on a similar type of claim, the Eleventh Circuit Court of Appeals explained why such a claim is not in keeping with the vindictive prosecution scenario envisioned by the Supreme Court. *Humphrey v. United States*, 888 F.2d 1546, 1549 (11th Cir. 1989). In *Humphrey*, the defendant was convicted on a six-count indictment relating to his involvement with stolen vehicles and falsified titles. *Id.* at 1547. While the defendant was seeking appellate and collateral relief from that conviction, a second eleven-count indictment was handed down against him involving different vehicles and co-conspirators. *Id.* at 1547-48, 1549. The defendant then filed a motion for habeas corpus relief claiming the second indictment was a vindictive prosecution, and the district court rejected the claim. *Id.* at 1548. The Eleventh Circuit upheld the ruling, explaining:

> In *Thigpen v. Roberts*, 468 U.S. 27, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984), the Supreme Court reiterated that where a defendant is indicted on more serious charges while pursuing appellate or collateral relief on original charges, a presumption of prosecutorial vindictiveness, in violation of Fifth Amendment due process, arises. The Court in *Thigpen* affirmed the ruling of the Fifth Circuit that the defendant was entitled to habeas corpus relief. *See also Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974).
>
> Both *Thigpen* and *Blackledge* are distinguishable from the facts before the court. First, both of the cases reviewed by the Supreme Court involved defendants who were originally charged with misdemeanors and, pending appeal of the misdemeanor convictions, were charged with felonies. Second, the offense charged in the second indictment in *Thigpen* arose out of the identical occurrence that gave rise to the original indictment. Likewise, in *Blackledge* the second indictment was based on the same incident as the original indictment.
>
> In *Blackledge* the Court addresses the situation of state retaliation by substituting a more serious charge for the original charge. Clearly that is not the situation in this action. Appellant has not faced stiffer charges arising out of one single incident. The charges in the second indictment are not a substitution; indeed, they are different charges based upon independent acts.

12

> Although the timing of the second indictment suggests that *Blackledge* and *Thigpen* are applicable, they are not.

*Humphrey*, 888 F.2d at 1549 (footnotes omitted).

[¶39] The State's forgery and theft charges against Ms. Mraz were not a substitution of charges for Ms. Mraz's overturned larceny conviction, and they did not up the ante on her overturned larceny conviction. The charges arose out of entirely separate circumstances that had no relationship to the overturned larceny conviction, and a presumption of vindictiveness is therefore not warranted.

[¶40] Finally, Ms. Mraz has cited no authority for the proposition that a skewed-appearing ratio of prosecutorial effort versus victim impact is sufficient to raise a presumption where one otherwise would not be recognized. Because Ms. Mraz has failed to show a violation of a clear and unequivocal rule of law as required by our plain error analysis, we reject her vindictive prosecution claim.

### C. Ineffective Assistance of Counsel

[¶41] Ms. Mraz claims her defense attorneys at trial were ineffective and failed to act as her advocate because they did not ask Robert Romeo and Robert Green, the motel and restaurant's assistant general manager and general manager, to explain discrepancies in their testimony concerning the timing and length of their investigation into the suspicious credit/debit card transactions. Ms. Mraz contends that these witnesses were critical to the State's case and defense counsel's failure to undermine their credibility by cross-examining them on the discrepancies, and their failure to call the jury's attention to the discrepancies, violated her Sixth Amendment right to effective assistance of counsel. We again disagree.

### 1. Standard of Review

[¶42] "Claims of ineffective assistance of counsel involve mixed questions of law and fact and are reviewed *de novo*." *Castellanos v. State*, 2016 WY 11, ¶ 95, 366 P.3d 1279, 1304 (Wyo. 2016) (quoting *Rhodes v. State*, 2015 WY 60, ¶ 28, 348 P.3d 404, 413 (Wyo. 2015)).

### 2. Analysis

[¶43] A defendant challenging the effectiveness of counsel bears the burden of proving that ineffectiveness. *Luftig v. State*, 2010 WY 43, ¶ 17, 228 P.3d 857, 864 (Wyo. 2010) (citing *Rutti v. State*, 2004 WY 133, ¶¶ 22–23, 100 P.3d 394, 405 (Wyo. 2004)). Based on our adoption of the two-prong test set forth in *Strickland*

*v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the defendant must prove both that counsel's performance was deficient, and that the defendant was prejudiced by the deficient performance. *Galbreath v. State*, 2015 WY 49, ¶ 4, 346 P.3d 16, 18 (Wyo. 2015) (citing *Frias v. State*, 722 P.2d 135, 145 (Wyo. 1986)). The defendant's burden is a heavy one, as we have explained:

> When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. We indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Under the two-prong standard articulated in *Strickland*, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to render such assistance as would have been offered by a reasonably competent attorney and that counsel's deficiency prejudiced the defense of the case. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

*Luftig*, ¶ 17, 228 P.3d at 864 (quoting *Dettloff v. State*, 2007 WY 29, ¶ 18, 152 P.3d 376, 382 (Wyo. 2007) (internal citations omitted)).

[¶44]  We have also said:

> We do not evaluate counsel's efforts in hindsight, but attempt to "reconstruct the circumstances surrounding the challenged conduct and evaluate the professional efforts from the perspective of counsel at the time." *Sincock v. State*, 2003 WY 115, ¶ 35, 76 P.3d 323, 336 (Wyo.2003). In evaluating counsel's performance, we determine whether his actions could be considered sound trial strategy. *Id*.

*Luftig*, ¶ 18, 228 P.3d at 865.

14

[¶45]  Ms. Mraz contends that the discrepancies in the testimony of Robert Romeo and Robert Green concerning the timing of their investigation and termination of Ms. Mraz's testimony must lead to the inescapable conclusion that their investigation lasted only a few days and not the weeks or months they claimed in their testimony.  She further contends that had defense counsel asked these witnesses about the discrepancies, this would have shined light on their untruthful testimony and discredited them.

[¶46]  Based on our review of the testimony of Mr. Romeo and Mr. Green, we must agree that these witnesses had a tenuous grasp on the timing of customer complaints, their investigations into those complaints, their meetings with Ms. Mraz, and their termination of her employment.  It does not follow, however, that asking the witnesses about the discrepancies would have discredited them, particularly since both witnesses expressed a willingness to defer to others on the timing.  Mr. Romeo testified:

> Q.      * * * [Y]ou're not sure about the passage of time; is that really what you're saying?
> A.      I'm not – I feel pretty confident, but I can't say with 100 percent certainty, because it's been a long time since –
> Q.      Okay.  All right.  But the customer was Dave Berry?
> A.      Yes.
> Q.      All right.  And the – Dave Berry might be able to fill in the gaps as to when he complained?
> A.      Oh, yeah.
> Q.      All right.  But is it your testimony that when he did, you started investigating?
> A.      Yes.

[¶47]  Robert Green testified:

> Q.      * * * What amount of time are we talking about in between this first ordering of you of the investigation and your final – to the best of your recollection, your final meeting with Ms. Mraz, how much time goes by?
> A.      I would have to say almost two months, I would say.  It was a while.  And, you know, that may be stretching it, but it seemed like a long time for them to go through all of these, in my mind.

15

Q. All right. And would Mr. Romeo be the best judge of how long that was?

A. Yeah, he would. Yes, he'll tell you.

[¶48] This Court has observed that "[c]ross-examination technique is an aspect of trial strategy which is best left to the trial attorney rather than to the supervision of appellate courts." *Hamburg v. State*, 820 P.2d 523, 528 (Wyo. 1991). In keeping with this, we have rejected speculation concerning cross-examination as a ground for finding ineffective assistance of counsel:

> Whether to cross-examine and the extent of cross-examination are strategic decisions. The risk of excessive cross-examination is that the witness may reconcile inconsistencies, additional unfavorable testimony may be elicited, and ineffective efforts to attack credibility may in fact enhance the witness's testimony. *Smith v. State*, 959 P.2d 1193, 1198 (Wyo.1998). Speculation as to how the cross-examination could have been conducted differently does not meet the *Strickland* test for ineffective assistance.

*Farmer v. State*, 2005 WY 162, ¶ 15, 124 P.3d 699, 705 (Wyo. 2005) (quoting *Barkell v. State*, 2002 WY 153, ¶ 23, 55 P.3d 1239, 1244 (Wyo. 2002)).

[¶49] Given the vagueness of Mr. Romeo's and Mr. Green's testimony concerning the timing of their investigation and the events surrounding the investigation, cross-examination on this part of their testimony would likely have been slippery and unproductive and may have simply allowed the witnesses to correct any inconsistencies. We find no ineffectiveness in the defense decision to forgo that area of cross-examination.

[¶50] We also disagree that counsel was ineffective for failing to call the jury's attention to these discrepancies in the testimony of Mr. Green and Mr. Romeo. The defense strategy was not only to challenge the adequacy and credibility of the investigation by Mr. Green and Mr. Romeo, and that of the State, but to cast suspicion on Mr. Green as the culprit. Defense counsel pointed to other suspicious transactions during the same period, including cash sales for which receipts were missing, cash transactions that were discounted or zeroed out, and the promotion of Ms. Mraz after a customer complaint had been received. Defense counsel stated during opening statements:

16

So, as with all of this, you ask yourself, as you hear the evidence as it comes in in the trial: Why are there missing receipts? Why are there zeros? Why are there discounts? Why didn't someone confront Miranda for two months? Why did they promote her to manager? There's a lot of whys, and I don't think the State can give you the answers[.]

[¶51] Defense counsel cross-examined both Robert Romeo and Robert Green at length, and then during closing argument pointed to gaps in the State's investigation. Defense counsel argued the reason for those gaps was the State's acceptance of Mr. Romeo's and Mr. Green's investigation and their insistence that the State look only at Ms. Mraz's transactions. Defense counsel argued: "Everything ends with Robert Green. He's convicted of fraud two times in the seven years before he takes over the general management of the Firewater Grill, and then shortly after Miranda's terminated, he's fired." Defense counsel argued that the truly suspicious transactions involved missing cash and that when customers starting complaining, Mr. Green set Ms. Mraz up so he could direct attention to credit/debit card transactions and away from the cash transactions.

[¶52] Pointing to vague discrepancies in Mr. Green's and Mr. Romeo's testimony concerning the timing of their investigation likely would have added little to the defense strategy. We certainly cannot conclude that the failure to highlight those discrepancies "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Luftig*, ¶ 17, 228 P.3d at 864. We therefore find no ineffectiveness of counsel.

## D. __Prosecutorial Misconduct__

[¶53] During closing arguments, defense counsel, in arguing the defense theory that Ms. Mraz had been set up, pointed out that the written alterations to the credit/debit card receipts were not very well done and were obvious changes to the original writing. Defense counsel then questioned why Ms. Mraz would make such flawed markings on a receipt to increase the amount of her tip when she could just as easily have increased the amount of the tip electronically when she ran the customer's card. The prosecutor responded during rebuttal argument, without objection:

The defendant – the attorneys for the defense at one point say, "Well, why do you have to alter it when you can just plug in that number?" Well, the simple answer to that is she got caught, and she got caught in

17

> a transaction that she wasn't able to hide because she
> didn't attempt to alter it.

[¶54]  Ms. Mraz contends that this statement is not supported by the evidence and was therefore prosecutorial misconduct and reversible error.

## 1.    Standard of Review

[¶55]  Because no objection was made to the prosecutor's comment at trial, we must review the comment for plain error.  Ms. Mraz must therefore "establish by reference to the record that a clear and obvious violation of a clear and unequivocal rule of law adversely affected a substantial right to such a degree that [she] was materially prejudiced."  *Vaught*, ¶ 14, 366 P.3d at 516.  Stated another way, Ms. Mraz must establish: 1) the record is clear about the incident alleged as error; 2) violation of a clear and unequivocal rule of law; and 3) that she was denied a substantial right resulting in material prejudice.  *Butler*, ¶ 16, 358 P.3d at 1264.

## 2.    Analysis

[¶56]  Ms. Mraz has established the first element of the plain error analysis in that the prosecutor's statement is clearly reflected in the record.  We turn then to whether the record shows an obvious violation of a clear and unequivocal rule of law.

[¶57]  A prosecutor's closing argument must be substantiated by the record.  *Hill v. State*, 2016 WY 27, ¶ 58, 371 P.3d 553, 568 (Wyo. 2016); *see also McGill v. State*, 2015 WY 132, ¶ 19, 357 P.3d 1140, 1147 (Wyo. 2015) (A prosecutor "must restrict his argument to the evidence presented to the jury.").  Ms. Mraz argues the prosecutor's above-quoted statement was not supported by the record because there was no evidence that Ms. Mraz was confronted about the suspicious transactions before the meeting in which her employment was terminated.  The State responds that there was in fact testimony by both Robert Romeo and Robert Green that they confronted Ms. Mraz after conducting their first review of transactions and then allowed her to continue working while they broadened their investigation.

[¶58]  We agree with the State as to the testimony of Mr. Romeo and Mr. Green concerning their initial confrontation of Ms. Mraz and her continued employment after that initial meeting.  The difficulty, however, is that the prosecutor's statement implied that after that meeting, Ms. Mraz changed her approach to padding her tips.  The record does not entirely support that inference.  The evidence shows that Ms. Mraz's tips were increased by way of simply charging

18

the inflated tip to the customer's card between the dates of November 4, 2013 and January 17, 2014. The written alterations occurred between December 20, 2013 and January 20, 2014. In other words, both types of manipulations were occurring during an overlapping period of time, and there was no clear stopping of one approach and starting of another.

[¶59] That said, even if the prosecutor meant to imply a clear stopping of one approach and starting of another, that is not precisely what he said, and what the record reflects instead is a somewhat vague comment on the evidence. When faced previously with this type of ambiguous factual scenario and alleged prosecutorial misstatement of the evidence, we have observed:

> This is precisely the type of case in which we are reluctant to find plain error in a prosecutor's closing argument. The questioned statement is not such a clear violation of a rule of law that we can say the second element of [the] plain error analysis is met.

*Stastny v. State*, 2011 WY 138, ¶ 16, 261 P.3d 747, 752 (Wyo. 2011).

[¶60] We find it difficult under these circumstances to find an obvious violation of a clear and unequivocal rule of law. Even if we were to find such a violation, we are unable to find that Ms. Mraz was denied a substantial right resulting in material prejudice. We have said:

> "Reversal as a result of prosecutorial misconduct is not warranted unless a reasonable probability exists that absent the error the defendant may have enjoyed a more favorable verdict." *Oldman*, 2015 WY 121, ¶ 13, 359 P.3d at 970 (citation omitted). "Allegations of prosecutorial misconduct are settled by reference to the entire record and 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.'" *Gonzalez–Ochoa v. State*, 2014 WY 14, ¶ 15, 317 P.3d 599, 604 (Wyo.2014) (quoting *Schreibvogel v. State*, 2010 WY 45, ¶ 39, 228 P.3d 874, 887 (Wyo.2010)).

*Hill*, ¶ 59, 371 P.3d at 568.

[¶61] The jury heard seven days worth of evidence and argument. We are not persuaded that the prosecutor's isolated and somewhat vague statement during

19

closing argument denied Ms. Mraz a fair trial and caused the jury to change its verdict. We therefore find no plain error in the prosecutor's statement.

## E.     Failure to Provide Supplemental Jury Instruction

[¶62]  During jury deliberations, the jury submitted the question, "Can we have a definition of 'forgery'?" The following exchange occurred in response to the jury question:

> [Prosecutor]: The State's position would be that they should be instructed – they should be referred, by the Court, to the instructions pertaining to that charge.
> * * *
> [Defense Counsel]: A similar position to the State's, except I wouldn't – I don't think the Court should emphasize any instruction over any other instruction, and should just tell them that they have to rely on the instructions, as given.
> THE COURT:     All right.  I'm concerned that trying to refer them to an instruction doesn't make sense in this case, because there are at least six element instructions for forgery.  There are other definitions that might relate to that, so I'm going to instruct them that: "I cannot give you a definition, other than what's contained in the instructions, and you need to refer to the instructions, as given."

[¶63]  Ms. Mraz contends that the district court committed plain error when it failed to provide the jury with a supplemental instruction defining the term "forgery."

## 1.     Standard of Review

[¶64]  The State contends that because the district court did what defense counsel asked in response to the jury question, Ms. Mraz should be barred by the doctrine of invited error from raising this issue on appeal. In *Vaught*, we addressed nearly identical circumstances and rejected application of the invited error doctrine, explaining:

> The facts of this case illustrate the sometimes fine line between positive acts and omissions. Vaught's counsel did in fact endorse a plan of action which the district court ultimately implemented.

20

However, that endorsement took the form of a simple agreement with the prosecutor's view. It was not an act of such independent intent that we can view it as a complete waiver of the error now alleged on appeal. Consequently, we will apply the plain error standard to that allegation.

*Vaught*, ¶ 35, 366 P.3d at 520.

[¶65]  For the same reasons, we will not apply the invited error doctrine to find a waiver here.  We will instead review the district court's response to the jury question using a plain error analysis, which again requires that Ms. Mraz establish: 1) the record is clear about the incident alleged as error; 2) violation of a clear and unequivocal rule of law; and 3) that she was denied a substantial right resulting in material prejudice.  *Butler*, ¶ 16, 358 P.3d at 1264.

## 2.    **Analysis**

[¶66]  As to the first element of the plain error analysis, the record contains the jury request for a supplemental instruction and the district court's response and is thus clear as to the incident alleged as error.  We turn then to the question of whether the district court's refusal to provide the jury with a supplemental instruction defining the term "forgery" violated a clear and unequivocal rule of law.

[¶67] We have said as follows concerning our review of a district court's instructions to a jury:

> When we review claims of error involving jury instructions, the district court is afforded significant deference. *Luedtke v. State*, 2005 WY 98, ¶ 28, 117 P.3d 1227, 1232 (Wyo.2005). A district court is "given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found." *Id*. (citations omitted); *see also Hawes v. State*, 2014 WY 127, ¶ 15, 335 P.3d 1073, 1078 (Wyo.2014). Its ruling on an instruction must be prejudicial to constitute reversible error. *Heywood v. State*, 2007 WY 149, ¶ 26, 170 P.3d 1227, 1234 (Wyo.2007) (citation omitted), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, 193 P.3d 266 (Wyo.2008). Because the purpose of jury

instructions is to provide guidance on the applicable law, prejudice will result when the instructions confuse or mislead the jury. *Id*.

*Brown v. State*, 2015 WY 4, ¶ 40, 340 P.3d 1020, 1031 (Wyo. 2015).

[¶68] We have further held that "if the original instructions are insufficient or if the jury expresses confusion or lack of understanding of a significant element of the applicable law, it is a court's duty to provide additional instructions." *Brown*, ¶ 43, 340 P.3d at 1031 (citing *Heywood v. State*, 2007 WY 149, ¶ 28, 170 P.3d 1227, 1235 (Wyo. 2007)). A supplemental instruction is not proper if it misstates the law. *Marfil v. State*, 2016 WY 12, ¶ 29, 366 P.3d 969, 977 (Wyo. 2016).

[¶69] Ms. Mraz was charged with forgery in violation of Wyo. Stat. Ann. § 6-3-602, which provides, in relevant part:

> (a) A person is guilty of forgery if, with intent to defraud, he:
>
> (i) Alters any writing of another without authority;
>
> (ii) Makes, completes, executes, authenticates, issues or transfers any writing so that it purports to be the act of another who did not authorize that act, or to have been executed at a time or place or in a numbered sequence other than was in fact the case, or to be a copy of an original when no such original existed; or
>
> (iii) Utters any writing which he knows to be forged in a manner specified in paragraphs (i) or (ii) of this subsection.

Wyo. Stat. Ann. § 6-3-602 (LexisNexis 2015).

[¶70] The jury was provided with separate instructions for each forgery count charged, which instructions were identical to each other with the exception of the date and named victim. As an example, Instruction No. 11 read:

> The elements of the crime of Forgery, as charged in Count I in this case, are:
> 1. On or about the 9th day of January, 2014;
> 2. In Sheridan County, Wyoming;
> 3. The Defendant, Miranda Rose Mraz;

22

4.    With intent to defraud;

5.    Altered any writing of another, namely Colin Peldo;

6.    Without authority.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

[¶71] The Wyoming act governing criminal offenses states, "No conduct constitutes a crime unless it is described as a crime in this act or in another statute of this state."  Wyo. Stat. Ann. § 6-1-102(a) (LexisNexis 2015).  We have interpreted this to mean:

The words of the statute emphasized above—"as a crime"—make it clear that conduct may not be charged as a crime unless it is made a crime by statute. Furthermore,

[I]t is well settled that criminal statutes are to be strictly construed, which means that they are not to be enlarged by implication or extended by inference or construction * * *. This rule, said to be based upon a conception of manifest justice and the plain principle that the power of punishment is vested primarily in the Legislature, requires a sufficient degree of certainty in a criminal statute, that will place it outside the necessity of judicial determination, through mere implication or construction, of who or what acts are punishable under it....

*State v. Stern*, 526 P.2d 344, 350 (Wyo.1974), quoting *State v. A.H. Read Co.*, 33 Wyo. 387, 240 P. 208, 212–13 (1925).

*Yellowbear v. State*, 2008 WY 4, ¶ 56, 174 P.3d 1270, 1292 (Wyo. 2008).

23

[¶72] Wyo. Stat. Ann. § 6-3-602(a)(i) defines the crime of forgery charged in this case, and the elements instructions given in this case mirrored the statute. It would have been improper for the district court to expand on that definition in response to the jury's question. Moreover, the jury question did not point to any particular part of the instructions or elements that was causing them confusion. For these reasons we find no plain error in the district court's response to the jury question.

## CONCLUSION

[¶73] Ms. Mraz's conviction was supported by sufficient evidence and her right to effective assistance of counsel was not violated. Furthermore, we find no plain error in her claim of vindictive prosecution, in her claim of prosecutorial misconduct, or in the district court's refusal to provide supplemental instructions to the jury. Affirmed.