# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 88

### APRIL TERM, A.D. 2025

August 6, 2025

SARAH RENEE FITZWATER,

Appellant
(Defendant),

v.

S-24-0300

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Carbon County*
The Honorable Dawnessa A. Snyder, Judge

*Representing Appellant:*
　　Brandon T. Booth, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Jeremy Meerkreebs, Assistant Appellate Counsel.

*Representing Appellee:*
　　Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Leanne J. Johnston, Assistant Attorney General.

*Before BOOMGAARDEN, C.J., and FOX, GRAY, FENN, and JAROSH, JJ.*

* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), she was reassigned to act on this matter on May 28, 2025.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]    After a bench trial, Sarah Fitzwater was convicted of multiple counts of welfare fraud related to applications she made for benefits under three different government assistance programs. On appeal, she challenges the sufficiency of the evidence supporting the convictions. We affirm.

## ISSUE

[¶2]    Ms. Fitzwater raises a single issue on appeal, which we rephrase as:

> Did the State present sufficient evidence for the district court to reasonably conclude beyond a reasonable doubt that Ms. Fitzwater knowingly made misrepresentations or omissions of material fact in obtaining welfare benefits?

## FACTS

[¶3]    Between 2017 and 2023, Ms. Fitzwater applied for various welfare benefits for herself and her three young children, which the State granted. After an investigation, the Wyoming Department of Family Services (DFS) discovered Ms. Fitzwater did not list Matthew Wagy, the children's father, as a household member on any of her benefit applications, even though it appeared Mr. Wagy and Ms. Fitzwater lived together. In addition, Ms. Fitzwater did not disclose several assets on her applications, including bank accounts, a timeshare she owned with her mother, and other real property.

[¶4]    As a result of the investigation, the State charged Ms. Fitzwater with nineteen counts of welfare fraud in violation of Wyo. Stat. Ann. § 42-2-112(a) (2025) (Counts 1-13) and (h) (Counts 14-19). These charges involved applications for assistance under three different government programs between 2017 and 2023: thirteen applications for the Supplemental Nutrition Assistance Program (SNAP), two applications for Medicaid, and four applications for the Low-Income Energy Assistance Program (LIEAP).[1] Each count alleged Ms. Fitzwater knowingly made false statements, representations, or material omissions on her applications for welfare benefits, and each alleged the value of the benefits exceeded five hundred dollars. Thus, the felony provision of Wyo. Stat. Ann. § 42-2-112(k)(i) was added to each charge. Separately, the State also charged Mr. Wagy with welfare fraud related to SNAP.

---

[1] SNAP applications are generally completed by applicants every three to six months. Medicaid and LIEAP applications are generally completed by applicants annually.

*Trial*

[¶5]    The case proceeded to a bench trial against both Ms. Fitzwater and Mr. Wagy in March 2024.  The State called fourteen witnesses, including benefit specialists and investigators from DFS.  The State also introduced more than 125 exhibits.  As part of its case, the State introduced the eligibility requirements for each of the benefit applications at issue — SNAP, Medicaid, and LIEAP.  Each application asks applicants to provide information pertaining to their household.  The SNAP application asks applicants to "Complete the information below for all persons living with you," and the LIEAP application asks an applicant to provide information for "ALL persons living in your home, whether or not you share living expenses, even if they are not related to you or are only temporarily living with you."  The Medicaid application requires disclosure of "anybody in your household or on your tax return."

[¶6]    The SNAP application also requests information about assets, specifically those "owned, jointly owned or [ ] being purchased by household members," and requires the applicant to check boxes next to and list any checking and credit union accounts, and real property, if "owned, jointly owned, or being purchased by household members."  The SNAP application also asks about vehicles "owned, jointly owned, or being purchased … even if the vehicle is not [] in your possession."

[¶7]    All three applications require the applicant to attest that the information they provide is true.  The SNAP application asks the applicant to certify "the information given is true and correct," while the LIEAP application asks the applicant to "certify, under penalty of perjury, the truth of the information contained in this application."  The Medicaid application informs applicants they are signing "under penalty of perjury" and that they must answer questions truthfully.

*Household*

[¶8]    Although Ms. Fitzwater did not list Mr. Wagy as a household member on any of her applications for assistance, the State introduced evidence that Mr. Wagy and Ms. Fitzwater lived together.  Specifically, on a 2017 SNAP application, Ms. Fitzwater listed her address as 57 Antelope Hills Road, Saratoga, and on four subsequent SNAP applications from 2017-2019 she listed her address as 57 Antelope Hills Road, Saratoga.[2]  She listed 405 Jackson Avenue, Encampment, as her address on her 2019-2022 SNAP applications, 2019 Medicaid application, and 2019-2021 LIEAP applications.  On her SNAP applications, Ms. Fitzwater also listed three children, and sometimes identified Mr. Wagy as a parent who did not live in the household.  In addition, in 2016 Ms. Fitzwater completed a Wyoming Voter Registration Application & Change Form listing her address as 57 Antelope Road,

---

[2] According to Mr. Wagy, Carbon County listed 50 Antelope Road as the address in the original building permit, but the address was subsequently changed to 57 Antelope Hills Road.

Saratoga, and in 2020 she completed a Wyoming Voter Registration Application & Change Form changing her address to 405 Jackson Avenue, Encampment. In short, the evidence showed Ms. Fitzwater lived at 57 Antelope Hills Road in Saratoga from 2017-2019, and then at 405 Jackson Avenue in Encampment from 2019-2022. Sometime after they moved to Encampment, Ms. Fitzwater also completed school registration forms that stated her children resided with both her and Mr. Wagy, and listed the Jackson Avenue address.

[¶9]    As for Mr. Wagy, the State introduced evidence that he also lived at 57 Antelope Hills Road in Saratoga from 2017-2019, and then at 405 Jackson Avenue in Encampment from 2019-2022, including the period covering the SNAP, Medicaid, and LIEAP applications at issue. Specifically, Mr. Wagy listed 57 Antelope Hills Road, Saratoga, as his address on Wyoming Voter Registration Application & Change Forms in 2016 and 2018. In 2020, like Ms. Fitzwater, he submitted a Wyoming Voter Registration Application & Change Form changing his address from 57 Antelope Hills Road, Saratoga, to 405 Jackson Avenue, Encampment. Mr. Wagy also listed 405 Jackson Avenue, Encampment, as his address on several work forms in 2019. He also listed the Jackson Avenue address on his candidate application to run for the Town Council in Encampment in 2020 and his application to run for Mayor of Encampment in 2022. Finally, Mr. Wagy listed 405 Jackson Avenue, Encampment, on a loan application with Blue Federal Credit Union dated April 16, 2021, and indicated on the application that he owned the house at that address.

[¶10]   During the trial, the State demonstrated how Ms. Fitzwater characterized her and Mr. Wagy's living situation. In an interview with DFS that was admitted into evidence, Ms. Fitzwater stated she rented from Mr. Wagy, but also admitted Mr. Wagy stayed with her part-time. At one point in the interview, when asked if Mr. Wagy was living with her, Ms. Fitzwater stated, "He would come up and stay with me" and "he stays with us … whenever he's off … three nights a week." Suzy McCartney, a benefits specialist for DFS, testified Ms. Fitzwater told her she and Mr. Wagy refinanced the Antelope Hills home in Mr. Wagy's name only, and removed Ms. Fitzwater's name. Ms. Fitzwater identified herself as a homeowner on her LIEAP application.

[¶11]   The State also introduced evidence that Ms. Fitzwater and Mr. Wagy held themselves out as husband and wife, although they have never been legally married. In 2015, the two held a wedding ceremony in Mexico. The Encampment Chief of Police, Kevin Shue, testified that in 2017, Ms. Fitzwater introduced herself to him as "Sarah Wagy." A DFS benefits specialist, Vicky Taylor, testified she heard Ms. Fitzwater call Mr. Wagy "her husband." A Senior Investigator with DFS, Dawn Royal, observed Ms. Fitzwater refer to Mr. Wagy as her "absolutely amazing hubby" on Facebook.[3] This public

---

[3] Despite the couple holding themselves out as married, at least some of the time, Mr. Wagy also paid Ms. Fitzwater child support for their three children.

portrayal of a marital relationship stood in stark contrast to how Ms. Fitzwater represented her household status on her welfare applications.

### Assets

[¶12]  The State also put on evidence regarding Blue Federal Credit Union (BFCU) bank accounts Ms. Fitzwater did not list on any of her SNAP applications.  Specifically, numerous bank statements from 2017-2021 showed Ms. Fitzwater as a joint owner of accounts at BFCU with Mr. Wagy, including a checking account, savings account, and money market account.  A DFS supervisor, Jessica Asbury, testified that an applicant is expected to report all bank accounts on SNAP applications, including those that are jointly owned, as they are considered assets.  While Ms. Fitzwater disclosed a Rawlins National Bank account on all of her SNAP applications, she did not disclose the BFCU accounts.  A BFCU employee, Sarah Ogle, testified joint owners to accounts have full access and the same privileges as a primary owner.  She further testified that opening a joint account requires both owners to come to the bank or call in together.[4]  During the investigation, Ms. Fitzwater told investigators about the "Blue account," and that she could access that account, despite denying knowledge of the account at first.  In addition to listing Ms. Fitzwater as a joint owner of the accounts, several of the BFCU statements introduced into evidence listed Ms. Fitzwater as a "co-borrower" on a Toyota Sequoia financed through BFCU.  Further, child support payments were deposited into the BFCU account in February 2017.  In addition, several of the statements show payments on a Chase credit card, and Ms. Fitzwater admitted during her interview she had such a card.

### Mr. Wagy's Testimony

[¶13]  Mr. Wagy testified at trial as a defense witness.  He testified about his and Ms. Fitzwater's living arrangement and explained the Antelope Hills Road property in Saratoga was his, and Ms. Fitzwater was the "beneficiary."  However, he maintained Ms. Fitzwater lived in the home with their children, while he lived in the backyard in a camper, which he eventually moved inside a newly built shop.  Mr. Wagy acknowledged on cross-examination that both his and Ms. Fitzwater's names were on the warranty deed as "husband and wife," which was dated approximately four months after their 2015 wedding ceremony in Mexico.

[¶14]  Mr. Wagy also testified that in 2019, he purchased the Jackson Avenue home in Encampment for Ms. Fitzwater and their children, and again followed them with his camper.  As with the Antelope Hills property, Mr. Wagy lived in the backyard of the Jackson Avenue home in a camper, built a shop, and then parked the camper in the shop.

---

[4] Ms. Fitzwater also did not disclose that she owned additional assets, including a timeshare in Colorado. On appeal, Ms. Fitzwater does not challenge the district court's conclusion that she failed to disclose additional assets, which formed part of the factual basis for counts one through thirteen.

Like the Antelope Hills home, the Jackson Avenue home was deeded in both parties' names. However, Mr. Wagy testified they lived separately.

[¶15] Mr. Wagy first denied the BFCU account was a joint account between he and Ms. Fitzwater, but later acknowledged "the papers" showed her to be a joint owner.

### Welfare Benefit Payments

[¶16] Kimberly Sapp, a DFS Eligibility Investigator, testified Ms. Fitzwater would not have been eligible for welfare benefits if she had properly disclosed information about Mr. Wagy. Mr. Wagy worked for HF Sinclair Corporation between 2017 and 2021, and earned paychecks that increased over time, but varied between over four thousand dollars a month to over seventeen thousand dollars a month. Ms. Sapp testified her job is to calculate overpayments after fraud investigations, which is "basically any amount of benefit that has been overissued." Ms. Sapp explained "an overpayment is [] the amount that [the applicant] [wasn't] eligible for." To calculate an overpayment of benefits, the department must "rework the case using actual circumstances." The DFS investigator then recalculates using actual household size, and here, Mr. Wagy's actual income from Sinclair. Ms. Sapp testified that if Mr. Wagy's income was taken into consideration, Ms. Fitzwater would not have been eligible for Medicaid. As for LIEAP, Ms. Sapp testified "all that was claimed was child support, and child support is not countable income for LIEAP." Specific to SNAP benefits, Ms. Sapp testified that if Mr. Wagy's income had been disclosed, Ms. Fitzwater would not have qualified for SNAP. Generally, if a person exceeds a "resource limit," they are not eligible for SNAP.[5] The investigator explained Ms. Fitzwater received an overpayment of SNAP benefits in the amount of $34,239.00, an overpayment of Medicaid benefits in the amount of $4,029.42, and an overpayment of LIEAP benefits in the amount of $3,549.78.

### Verdict and Sentence

[¶17] The district court found Ms. Fitzwater guilty of eighteen counts of welfare fraud. For counts one through thirteen, the court found Ms. Fitzwater knowingly misrepresented or failed to disclose a material fact on the SNAP applications when she did not disclose Mr. Wagy as a household member.[6] The court specifically and "easily" found Mr. Wagy was a resident of the home, despite residing in the camper "on occasion." Regarding the BFCU account, the court noted Ms. Fitzwater must have known about the account because child support payments from Mr. Wagy were deposited into the BFCU account. The district court noted the account did not indicate the amount withdrawn "going out as child support," and there had been no change in support at that time. Furthermore, Ms. Fitzwater

---

[5] "Resources" may include "bank accounts, checking, savings, CDs, money market, stocks, bonds … vehicles, trailers, utility trailers, fifth wheels, ATVs, vehicles."
[6] The district court dismissed Count XIV on the State's motion.

financed and made payments on her Toyota Sequioa at BFCU. The court also explained other payments out of the BFCU account were indicative of Ms. Fitzwater's interest in the account, including Chase credit card payments. The court explained that Mr. Wagy's status as a household member and the bank account were the "crux" of the State's case, but recognized other required information was also missing from the applications. For counts fifteen through nineteen, which pertained to the Medicaid and LIEAP applications, the district court again found Ms. Fitzwater failed to disclose a material fact on the applications, concluding there was "overwhelming evidence" Mr. Wagy lived in the household. The district court also found Mr. Wagy guilty on nine counts of welfare fraud.

[¶18] The district court sentenced Ms. Fitzwater to concurrent four-to-seven-year prison terms on each count, suspended in favor of a split sentence of six months in jail followed by three years of supervised probation. The court stayed the execution of the sentence for six months, and ordered Mr. Wagy and Ms. Fitzwater to pay back $44,686.20 in overpayments and reimburse the State for $3,776.54 in costs.

[¶19] This appeal followed.

## STANDARD OF REVIEW

[¶20] We review a claim of insufficient evidence after a bench trial with the same standard as we do for reviewing a guilty verdict after a jury trial. *Mathewson v. State,* 2018 WY 81, ¶ 15, 431 P.3d 1121, 1124 (Wyo. 2018) (citing *Faubion v. State,* 2010 WY 79, ¶ 12, 233 P.3d 926, 929 (Wyo. 2010); *Tennant v. State,* 776 P.2d 761, 763 (Wyo. 1989)). In our inquiry, we "examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it." *Id.* (quoting *Mraz v. State,* 2016 WY 85, ¶ 18, 378 P.3d 280, 286 (Wyo. 2016)). This applies whether the supporting evidence is direct or circumstantial. *Id.* We also "disregard any evidence favorable to the appellant that conflicts with the State's evidence." *Huckins v. State,* 2020 WY 21, ¶ 10, 457 P.3d 1277, 1279 (Wyo. 2020) (citing *Thompson v. State,* 2018 WY 3, ¶ 14, 408 P.3d 756, 761 (Wyo. 2018) (other citation omitted)). We do not substitute our judgment for the [trier of facts] judgment – instead, we ask whether [the trier of facts] could have reasonably concluded as it did. *Mathewson,* ¶¶ 15-16, 431 P.3d at 1124. The question for this Court "is not whether the evidence was sufficient to establish guilt beyond a reasonable doubt, rather it is whether the evidence could reasonably support such a finding by the factfinder." *Id.,* ¶ 16, 431 P.3d at 1124 (citing *Mraz,* ¶ 19, 378 P.3d at 296).

## DISCUSSION

[¶21] Ms. Fitzwater argues the State failed to carry its burden at trial and did not present sufficient evidence to prove she knowingly misrepresented material facts on her benefits applications. More precisely, Ms. Fitzwater's appeal is limited to two assertions: a) the State did not present sufficient evidence to establish she knowingly misrepresented or

omitted Mr. Wagy was a household member; and b) the State did not present sufficient evidence to establish she owned the BFCU bank accounts and knowingly omitted them from her applications.[7]

[¶22] Wyoming Statute Ann. § 42-2-112(a), states: "No person shall knowingly make a false statement or misrepresentation [or] fail to disclose a material fact . . . in obtaining any form of supplemental nutrition assistance benefit under the supplemental nutrition assistance program [SNAP]." Wyoming Statute Ann. § 42-2-112(h), which applies to Medicaid and LIEAP, states: "No person shall knowingly make a false statement or misrepresentation [or] knowingly fail to disclose a material fact . . . in obtaining public welfare benefits."[8]

[¶23] "Knowingly," as it is used in the welfare fraud statutes, does not have a technical definition. As a result, its ordinary meaning applies. *Gonsalves v. State,* 2024 WY 49, ¶ 14, 547 P.3d 340, 344 (Wyo. 2024). The ordinary meaning of "knowingly" is "with awareness, deliberateness, or intention as distinguished from inadvertently or involuntarily." *Id.* (other citations omitted). "It means the defendant[s] realized what [they] were] doing and [were] aware of the nature of [their] conduct and did not act through ignorance, mistake, or accident." *Id.* (quoting *Barrett v. State,* 2022 WY 64, ¶ 36, 509 P.3d 940, 948 (Wyo. 2022) (citation omitted)). A factfinder may draw reasonable inferences of intent from a defendant's conduct because direct evidence of intent is rare. *Gonsalves,* ¶ 14, 547 P.3d at 344. The law does not distinguish between direct and circumstantial evidence. *Stroble v. State,* 2020 WY 158, ¶ 11, 478 P.3d 649, 652 (Wyo. 2020). In fact, circumstantial evidence is most often the only proof of intent that is available. *Gonsalves,* ¶ 11, 547 P.3d at 343. This Court has held that intent may be proven by circumstantial evidence alone, in which case we look at the defendant's conduct. *Id.*

## I. The evidence was sufficient to prove Ms. Fitzwater knowingly failed to disclose Mr. Wagy as a household member on her welfare applications.

[¶24] Ms. Fitzwater first argues the State did not provide sufficient evidence to show she knowingly failed to disclose Mr. Wagy as a household member on her various applications. However, the record demonstrates the State presented significant evidence showing Ms. Fitzwater and Mr. Wagy lived in the same household and Ms. Fitzwater knowingly omitted that fact from her applications.

---

[7] The parties consistently refer to a single BFCU account in the briefing. However, a review of the record shows Mr. Wagy and Ms. Fitzgerald were joint owners of multiple accounts at BFCU.

[8] The thirteen counts of welfare fraud in violation of § 42-2-112(a) all related to Ms. Fitzwater's various SNAP applications, ranging in dates from July 12, 2017, to November 17, 2022. The five counts under § 42-2-112(h) related to Ms. Fitzwater's Medicaid and LIEAP applications received from November 15, 2019, to November 2, 2021.

[¶25] Specifically, the evidence included their children's school records (listing their parents as having the same address), Mr. Wagy's and Ms. Fitzwater's Wyoming Voter Registration Application & Change Forms (listing the same addresses), Mr. Wagy's applications to run for town council and then mayor of Encampment (listing his address as the same as Ms. Fitzwater's), and Mr. Wagy's loan application at BFCU in 2021 (listing his address as the same as Ms. Fitzwater's and indicating he owned the residence there). On the school registration records, when asked, "with whom does the child reside," Ms. Fitzwater's answer was: Sarah Fitzwater and Matt Wagy. Further, Mr. Wagy and Ms. Fitzwater publicly held themselves out as married on Facebook. Mr. Wagy also listed Ms. Fitzwater as his spouse on work forms, including his group life insurance form. At trial, Encampment Chief of Police Kevin Shue testified he first met Ms. Fitzwater in 2017 and she introduced herself as "Sarah Wagy" and "stated she lived [at the Antelope Hills address] with [her] husband [Matt Wagy] and they had had the house built." Chief Shue also testified on the day of Ms. Fitzwater's arrest for the crimes charged, Mr. Wagy was sleeping in the house, not outside in the trailer. Finally, Ms. Fitzwater admitted during her interview with DFS Mr. Wagy stayed with her "often" and "three nights a week" and "whenever he's off [work]," and that she and Mr. Wagy owned the Encampment house together.

[¶26] Based upon this evidence, it was reasonable for the district court to conclude Mr. Wagy lived with Ms. Fitzwater in the same household and that Ms. Fitzwater knowingly omitted Mr. Wagy from her benefit applications as a member of her household. *See Smith v. State,* 2009 WY 2*,* ¶ 17, 199 P.3d 1052, 1058 (Wyo. 2009) ("When evidence is presented that is capable of producing conflicting inferences, the determination of which inference is proper should be left to the [factfinder]."). Though Ms. Fitzwater argues evidence existed that Mr. Wagy did not live in the home with her at any time, we follow the dictates of our standard of review and disregard all of Ms. Fitzwater's conflicting evidence, giving the State the benefit of all favorable inferences. *See Mathewson,* ¶ 15, 431 P.3d at 1124 (concluding the State offered sufficient evidence to show requisite fraudulent intent).

[¶27] Accepting the State's evidence as true, drawing all reasonable inferences from that evidence, and disregarding Ms. Fitzwater's conflicting evidence, we conclude the record contains sufficient evidence for the district court to have reasonably concluded Ms. Fitzwater knowingly omitted Mr. Wagy's name as a household member on her welfare benefits applications.

[¶28] Our conclusion that Ms. Fitzwater knowingly omitted Mr. Wagy as a household member on her applications alone is enough to affirm the district court's conviction on all eighteen counts. Nonetheless, we will briefly address Ms. Fitzwater's assertions regarding her omission of the BFCU accounts from her applications.

**II.    The evidence was sufficient to prove Ms. Fitzwater knowingly failed to disclose the Joint BFCU Accounts on her SNAP applications.**

[¶29]  Ms. Fitzwater also argues the State presented insufficient evidence to show she owned the BFCU accounts, or if she did, that she knowingly omitted the accounts from her welfare benefits applications.  However, the record demonstrates the State presented significant evidence Ms. Fitzwater owned and knowingly failed to disclose the BFCU accounts on her SNAP applications.

[¶30]  It is undisputed Ms. Fitzwater failed to disclose the BFCU accounts on her SNAP applications, despite the fact that the applications plainly require disclosure of assets "owned" or "jointly owned."  The State introduced bank statements from BFCU expressly stating Ms. Fitzwater was a joint account owner with Mr. Wagy, including a savings account, a checking account, a money market account, and a loan on a Toyota Sequoia.  In addition, activity within those accounts was indicative of Ms. Fitzwater's ownership.  For example, in February 2017, there is a deposit of child support payments, and the evidence was that Mr. Wagy was making child support payments to Ms. Fitzgerald.  There were also numerous payments from the BFCU accounts on a Chase credit card throughout the relevant time period, and Ms. Fitzwater admitted during her interview with DFS that she owned a Chase credit card.  In the interview, Ms. Fitzwater also told investigators about the "Blue account," and that she could access and spend money from that account, despite denying knowledge of the account at first.  Finally, the State offered unrefuted testimony from Ms. Ogle, a risk management specialist at BFCU, that joint owners to accounts have full access and the same privileges as a primary owner.  That is to say, the money in the BFCU accounts was accessible to Ms. Fitzwater as much as it was accessible to Mr. Wagy.  All of this evidence was sufficient for the district court to reasonably conclude Ms. Fitzwater owned the BFCU accounts along with Mr. Wagy.

[¶31]  Even if Ms. Fitzwater somehow was not an owner of the BFCU accounts, she was still required to disclose the accounts on the SNAP applications, which under the heading "Tell Us About the Household's Assets" required her to disclose "assets owned, jointly owned, or being purchased by *household members.*" (emphasis added).  Because Mr. Wagy was a household member and the primary owner of the BFCU accounts, Ms. Fitzwater improperly omitted the BFCU accounts information from the SNAP applications.

[¶32]  As for whether Ms. Fitzwater knowingly omitted the information from the applications, the evidence at trial was that Ms. Fitzwater understood what information was requested on the welfare benefits applications, because she did in fact disclose her Rawlins National Bank account on the applications.  In addition, on her May 2022 SNAP application, she listed both herself and Mr. Wagy as owners of the Rawlins National Bank account, demonstrating an understanding that accounts held jointly should be listed along with the name of each owner.  Given this evidence, the district court, as the factfinder,

9

could have reasonably inferred Ms. Fitzwater realized what she was doing and knowingly omitted the BFCU accounts from her SNAP applications.

[¶33]   Accepting the State's evidence as true, drawing all reasonable inferences from that evidence, and disregarding Ms. Fitzwater's conflicting evidence, we conclude the record contains sufficient evidence for the district court to have reasonably concluded Ms. Fitzwater jointly owned the BFCU accounts and knowingly omitted the accounts on her welfare benefits applications.

## CONCLUSION

[¶34]   The State presented sufficient evidence for the District Court to reasonably conclude Ms. Fitzwater knowingly made misrepresentations or omissions of material fact in obtaining welfare benefits.  As a result, her convictions for eighteen counts of welfare fraud are affirmed.